566 P.2d 322

**Elzie SHIRLEY and Willie Lynn Shirley, his wife, Appellants,**

v.

**NATIONAL APPLICATORS OF CALIFORNIA, INC., a California Corporation doing business in Arizona, and Rosario Brabant, Appellees.**

No. 2 CA–CIV 2365.

Court of Appeals of Arizona, Division 2.

April 26, 1977.

Rehearing Denied May 26, 1977.

Review Denied June 14, 1977.

Otto H. Linsenmeyer and Frank E. Dickey, Jr., Phoenix, for appellants.

Platt & Jenson, P. C. by Dennis D. Jenson, Coolidge, for appellees.

## OPINION

RICHMOND, Judge.

Appellants are the owners of a tract of land suitable for use as a sand and gravel pit. On May 9, 1972, appellants entered into a written lease with appellee National Applicators of California, Inc., permitting the latter to conduct sand and gravel operations on the property for a period of three years. The lease set forth a royalty schedule and contained a non-assignment clause.

Appellee Rosario Brabant was engaged by National on a per ton basis to provide crusher services. "Pit run" from the sand and gravel operation was processed to create a product designated "mineral aggregate." National sold a substantial amount of this material for use in the Arizona City project and stockpiled approximately 40,000 tons in the event further orders were received. Because of Brabant's exceptionally high crusher costs, National vested ownership of the stockpile in him subject to payment of 40 cents a ton to National to cover stripping costs and 10 cents a ton royalty to appellants. A chain link fence was erected by National around the stockpile, and National's interest in the fence subsequently was acquired by Brabant.

On May 26, 1973, Willie Lynn Shirley commenced a civil action in Pinal County, seeking judgment declaring the lease void in that it had been made without her knowledge and consent. A temporary restraining order prohibiting the use of the premises by National under the lease, and an order requiring National to show cause why a preliminary injunction should not issue were entered the same day. Hearing on the order to show cause was continued several times by stipulation of the parties' attorneys, and no hearing on the temporary restraining order ever was held. On May 18, 1973, National's motion to dismiss the complaint without prejudice was granted, but the dismissal later was set aside. The case eventually was dismissed for lack of prosecution on May 28, 1974.

During the term of the lease appellants asserted ownership of the stockpile, removed the chain link fence, and sold a portion of the materials. Appellees never were paid for the amounts removed from the stockpile and the fence was never returned. Brabant later erected a barbed wire fence around the stockpile, but this also was removed by appellants and never returned. Appellants also removed "pit run" material from the property and sold it to various purchasers.

Thereafter, appellees brought suit for breach of the lease agreement, conversion, and for renewal of the lease. Appellants counterclaimed to quiet title in the land and to declare that appellees had no interest therein. After trial to the court, a judgment for damages was entered in favor of appellees, who were granted access to remove the stockpile and remaining "pit run" subject to the royalty rights in appellants. Judgment quieting title to the land was entered in favor of appellants. This appeal followed.

■ Appellants have presented numerous questions for our determination. Initially they contend that the trial court's findings of fact and conclusions of law are clearly erroneous.[1] In support of this position ap-

---

1. Appellants assert that the lease should have been construed most strongly against National because the lawyer who prepared it was a statutory agent and attorney for National. The trial court found, however, that the lawyer was acting "for both parties to the lease in its preparation." We agree. The record reflects that while he was the attorney for National, he also

pellants urge that 26 findings and 14 conclusions are either incomplete, immaterial or incorrect. We have reviewed the transcript and exhibits in the light most favorable to upholding the judgment below and disagree. The findings of fact are supported by credible evidence and this court will not disturb them. *See Bevins v. Dickson Electronics Corporation*, 16 Ariz.App. 105, 491 P.2d 494 (1971). The pertinent disputed conclusions of law, having also been raised under other issues presented, are discussed in detail below.

Appellants' second contention is that National breached the lease by (1) failing to remove the maximum amount of sand and gravel; (2) stockpiling material on the premises; (3) failing to provide a licensed engineer's report; (4) failing to comply with conditions precedent concerning foundational requirements for establishing amounts of material, and (5) abandoning the premises. Again, we disagree.

■ The lease provided that the tract was to be used in such a manner as "to take out the greatest possible amount of sand and gravel therefrom with due regard to the development and preservation of said tract as a workable sand and gravel property." The trial court found that under this broad clause National was not required continuously to remove sand and gravel from the premises during the entire term of the lease. We cannot say that this construction is unreasonable. We also note that appellee National was unable to conduct work at the site for a period of more than one year because of the pending declaratory judgment action.

■ The lease was granted for the purpose of permitting National "to conduct sand and gravel operations", and the trial court did not err in finding that the stockpiling of material on the premises after removal was within such purpose and consistent with the development and preservation of the leased premises as sand and gravel property.

■ Section 1, subsection (d), of the lease provides:

". . . Cubic yard quantities shall be determined by the volume of sand and gravel placed by Lessee on any job upon which sand and gravel from the premises is applied, said quantity to be determined by the engineer's report upon said job . . . ."

Appellants argue that the engineer must be a licensed engineer in order for the reports to be valid. The record, on the other hand, reflects that the "project engineer" of Arizona City furnished the figures used in computing the amounts of materials delivered. We do not believe that a licensed engineer was required under the circumstances of this case to furnish the report in question. "Engineer" is a generic term covering many areas of human activity which do not come within the classification of licensed engineer. *See State v. T. V. Engineers of Kenosha, Inc.*, 30 Wis.2d 434, 141 N.W.2d 235 (1966). Numerous job classifications in both the public and private sector use the word "engineer" to designate types of employment which do not require the same knowledge and training in the fields of mathematics, physics and chemistry as a prerequisite to registration as a professional engineer. *State v. T. V. Engineers of Kenosha, Inc.*, supra. As the court stated in *Employers' Liability Assur. Corporation v. Accident & Casualty Ins. Co.*, 134 F.2d 566, 569 (6th Cir. 1943):

"The term 'engineer' is not one of such limited connotation. In common parlance practical engineers, as well as graduate or licensed engineers, are included in the designation of persons as engineers. Webster defines 'engineer' as 'one versed in or who follows as a calling or profession any branch of engineering,' and 'engineering' in its modern and extended sense, as 'the art and science by which the mechanical properties of matter are made useful to man in structures and machines.' "

had been Shirley's attorney in other matters. He testified that he was merely bringing together two clients with mutual interests and

billed each of them one-half of the cost of the lease.

Had appellants desired the report of a licensed engineer, they should have so specified, which was done in a later, unrelated provision of the lease. Notwithstanding the above, we are unable to find that appellants were prejudiced by the project engineer's figures.

The lease permitted the lessor to remove sand and gravel from the pit area, and further provided:

"As consideration for removal of said sand and gravel, Lessor shall pay to Lessee a price per cubic yard removed which said price shall be calculated at an amount equal to the total cost of removal of the overburden as the same bears to a total of 200,000 cubic yards of material."

At trial, however, the parties agreed that appellants should be charged at the rate of 15 cents per cubic yard of material they removed, and the judgment includes an award to National computed on that basis. Appellants contend that as a condition precedent to their liability it was necessary for National to prove the amount of overburden removed. They interpret "200,000 cubic yards of material" in the foregoing provision as referring to cubic yards of overburden, rather than material removed from the pit, and argue that the price payable to National cannot be computed until the amount of overburden removed is determined. Inasmuch as the judgment was computed at the price alleged in their answer and agreed to at trial, we need not dispute their interpretation, although we believe the provision when read in context clearly refers to cubic yards of material from the pit rather than overburden.

■ Appellants' contention that the premises had been abandoned is equally without merit. Intent is an essential element of abandonment, *Mason v. Hasso*, 90 Ariz. 126, 367 P.2d 1 (1961), and the record reflects no such intent. In fact, National sought to extend the lease at the end of its term.

As a third contention, appellants argue that Brabant should not have been allowed to recover because he had no contractual connection with appellants. It is urged that National breached the lease by transferring ownership of the stockpile to Brabant, who could not assert a claim against appellants if the transfer was ineffective. As for the removal of the fences, appellants claim they owed no duty to Brabant as he was a trespasser. The trial court found that the sand and gravel became personal property on dislodgment from the tract, and that the agreement between Brabant and National concerning the ownership of the stockpile did not constitute an assignment or sublease. Brabant therefore acquired the rights to the stockpile that National could claim under the lease.

■ Brabant did not seek recovery on a contract theory, but rather sought and was awarded damages for conversion of his property by appellants. The sand and gravel became personalty when severed from the freehold. *See Giuliano Construction Company v. Simmons*, 147 Conn. 441, 162 A.2d 511 (1960); *Smithrock Quarry, Inc. v. State*, 60 Wash.2d 387, 374 P.2d 168 (1962); 73 C.J.S. Property § 11 (1951). Upon severance the materials were owned by National subject to the payment of royalties to appellants. Brabant was on the premises as an invitee of National. *See Welter v. M & M Woodworking Company*, 216 Or. 266, 338 P.2d 651 (1959). He was not a trespasser. *See Williams v. Morristown Memorial Hospital*, 59 N.J.Super. 384, 157 A.2d 840 (1960). Once the sand and gravel became personalty, National could vest Brabant with its ownership. If National could sell the material subject to payment of royalties, it could transfer ownership to Brabant subject to those same payments.

■ The duties and liabilities of a landlord to persons on the leased premises by the consent of the tenant are the same as those owed to the tenant himself. *See Rendall v. Pioneer Hotel*, 71 Ariz. 10, 16, 222 P.2d 986 (1970). It is clear that appellants had no right to convert stockpiled materials or fencing owned by National, and they could no more take them from Brabant, who entered the premises to crush rock in furtherance of National's sand and gravel operations under the lease.

Finally, appellants urge that National should be liable to indemnify them from any claim by Brabant because of the indemnity provision of the lease, which provides that the lessee

". . . [shall] indemnify, protect and save harmless Lessor from and against all claims, demands and damages in any manner arising out of or incidental to Lessee's use of said tract or of the right of ingress or egress thereto."

We agree with National, however, that the intent of the parties was to place ultimate responsibility upon National for its own acts or those of its agents or subordinates, and to relieve appellants from claims, demands or damages "arising out of or incidental to *Lessee's* use of said tract."

Indemnity agreements are construed to cover only those losses or liabilities which reasonably appear to have been intended by the parties. *Barnes v. Lopez,* 25 Ariz.App. 477, 544 P.2d 694 (1976). Arizona is committed to the proposition that the indemnitee is not entitled to be compensated for losses occasioned by its own wrong unless the indemnity agreement expresses such intention in *clear and unequivocal terms. Royal Properties, Inc. v. Arizona Title Ins. & Tr. Co.,* 13 Ariz.App. 376, 476 P.2d 897 (1970). Here the "save harmless" clause is couched in broad, general language and fails to satisfy the stringent requirements enunciated in *Royal Properties. See Allison Steel Manufacturing Co. v. Superior Court,* 22 Ariz.App. 76, 523 P.2d 803 (1974).

Affirmed.

HOWARD, C. J., and HATHAWAY, J., concur.