694 P.2d 815

**CECIL LAWTER REAL ESTATE SCHOOL, INC., an Arizona corporation, Plaintiff-Appellee,**

v.

**TOWN & COUNTRY SHOPPING CENTER CO., LTD., Defendant-Appellant.**

**TOWN & COUNTRY SHOPPING CENTER CO., LTD., Third Party, Plaintiff-Appellee,**

v.

**TRANSAMERICA DEVELOPMENT COMPANY, Third Party, Defendant-Appellant.**

**Nos. 1 CA–CIV 6441, 1 CA–CIV 6400.**

Court of Appeals of Arizona, Division 1, Department D.

Dec. 11, 1984.

Mohr, Hackett, Pederson, Blakley & Randolph, P.C. by Arthur W. Pederson, Charles I. Kelhoffer, Phoenix, for Town & Country Shopping Center Co., Ltd.

Murphy & Posner by K. Bellamy Brown, Phoenix, for Transamerica Development Co.

Burch & Cracchiolo, P.A. by Edwin C. Bull, Frank Haze Burch, Arda S. Rutherford, Phoenix, for plaintiff-appellee, Cecil Lawter Real Estate School, Inc.

## OPINION

OGG, Judge.

These consolidated appeals arise out of a lease agreement entered into by plaintiff-appellee, Cecil Lawter Real Estate School (Lawter) and third party defendant-appellant, Transamerica Development Company (Transamerica).

Prior to discussing the legal issues presented, we review the facts giving rise to these appeals. On September 14, 1970, Cecil B. Lawter and his wife, Isabelle Lawter, entered into a lease agreement with Transamerica, through its vice-president, Don Owen. The terms of the lease were negotiated by Cecil Lawter and Velma Ludtke, assistant secretary and project manager of Transamerica. The 1970 lease provided that Lawter would lease from Transamerica certain premises located in the Town & Country Shopping Center at 2095 East Camelback Road, Phoenix, Arizona. The parties agreed that Lawter would pay a "fixed minimum rent" of $742.88 per month, plus additional charges for utilities, common area maintenance and other expenses. During the time the 1970 lease was in effect, the additional charges fluctuated between $881.09 and $1,010.01 per month.

Eventually a second lease was executed between Lawter and Transamerica on Feb-.

ruary 14, 1972. Once again, Cecil Lawter and Velma Ludtke negotiated the terms of the 1972 lease. The lease was signed by Cecil Lawter and by Don Owen on behalf of Transamerica. Under the heading "FUNDAMENTAL LEASE PROVISIONS AND EXHIBITS", the lease provided:

1. SECTION 8.2. *Increases in Real Estate Taxes.* The term "basic taxes" as used in this section means the aggregate of the real estate taxes and assessments, taken separately and allocable to the lease year on an accrual basis under generally accepted accounting principles, which may be levied or assessed for the full tax or assessment year following the commencement of the Lease Term against (a) all buildings in the Shopping Center on the commencement of the Lease Term and on the land upon which the buildings are situated, and (b) the parking and accommodation areas in the Shopping Center (but only to the extent that the parking and accommodation areas have not been included in Section 13.3 hereof).

Should the real estate taxes and assessments payable by Landlord in any lease year with respect to such land, buildings, and parking and accommodation areas as exist on the commencement of the Lease Term exceed the basic taxes, excluding any increase in such taxes or assessments that is the result of improvements in or additions to the Shopping Center made either by Landlord or any lessee of Landlord after the commencement of the Lease Term (other than those made by Tenant), Tenant shall pay to Landlord, upon demand, accompanied by satisfactory proof that such taxes or assessments have been paid by Landlord, an amount equal to that portion of such increase as the total floor area of the premises bears to the total net rentable floor area in the Shopping Center at the time such tax or assessment shall become due and payable. A copy of any such computation shall be furnished Tenant.

In the event any taxes or assessments are levied on improvements in or additions to the Shopping Center made by either Landlord or any tenant therein after the commencement of the Lease Term, which taxes or assessments are excluded from basic taxes and are not separately assessed but are included within the taxes or assessments levied or assessed upon the entire Shopping Center, then a fair and equitable allocation of such taxes or assessments on said improvements or additions so made after the commencement of the Lease Term, on one hand, and the balance of the Shopping Center improvements, on the other hand, shall be made. In making the allocation, due weight shall be given to the factors which determine the amount of the real property taxes or assessments in question with respect to all such improvements and additions to the Shopping Center and to the provisions of this Lease.

"FIXED ~~MINIMUM~~ RENT: $1,566.34 per month ..." Further on in the lease, clauses provided that Lawter would be required to pay, upon demand by Transamerica, a proportionate share of all real estate tax increases [1], any rent tax imposed [2], a proportionate share of the utilities furnished [3],

2. SECTION 8.3 *Excise Taxes.* Any excise, transaction, sales or privelege [sic] tax now or hereafter imposed by any government or governmental agency upon Landlord and attributed to or measured by rent or other charges or prorations payable by Tenant shall be paid by Tenant in addition to and along with the rent otherwise payable hereunder.

3. SECTION 11.1. *Utilities.* Tenant shall promptly pay for all public and other utilities and related services rendered or furnished to the premises during the Lease Term, including, but not limited to, water, gas, electricity, telephone, and sewer charges. Landlord may install re-registering meters and collect any and all charges aforesaid from Tenant, making returns to the proper public utility company or governmental unit, provided that Tenant shall not be charged more than the rates it would be charged for the same services if furnished direct to the premises by such companies or governmental units.

Landlord shall provide and maintain the necessary mains, conduits, wires, and cables to bring water and electricity to the premises. If Landlord should elect to supply electricity, with or without re-registering meters, Tenant shall purchase its requirements from Landlord. If re-registering meters are not installed, Tenant shall pay to Landlord for electricity an amount to be determined by applying to the total charge billed to the Center by the public utility company or governmental unit, reduced by the portion applicable to the accommodation and parking areas, a fraction the numerator of which is the total connected wattage in the premises and the denominator of which is the aggregate of the connected wattage in the total rental area in the Center; provided that if Landlord shall receive a preferred rate or quantity discount from the public utility company or governmental unit, such preferred rate or discount shall inure to the benefit of Landlord, even though the billing to Landlord reflects only a net amount.

SECTION 11.2. *Discontinuance of Service for Non-Payment.* Payment for any and all water, gas, electricity, hot and cold air used by Tenant and furnished by Landlord shall be made monthly and within ten (10) days of the presentation of bills by Landlord to Tenant. Landlord may cut off and discontinue, without notice to Tenant, water, gas, electricity, heated water, chilled water, steam, hot and cold air, or any other service whenever and during any pe-

and a proportionate share of common area charges.[4]

Transamerica accepted Lawter's monthly checks in the amount of $1,566.34 from commencement of the lease until the property was acquired by defendant-appellant Town & Country Shopping Center Company, Ltd. (Town & Country) in December, 1972.[5] Town & Country thereafter accepted Lawter's monthly checks of $1,566.34 until January, 1977. At that time, Lawter was notified by Town & Country that Lawter was responsible for Town & Country's actual costs of supplying Lawter's premises with electricity and common maintenance. Town & Country demanded that Lawter pay arrearages in the amount of $154.94 for rent and other charges and $668.86 for payment of Lawter's share of property taxes. Lawter refused to pay the sums requested and subsequently, on August 15, 1978, filed an action for declaratory relief against Town & Country. Town & Country subsequently counterclaimed for declaratory relief against Lawter.

In August, 1979, Town & Country filed a third party complaint against Transamerica, claiming that, if Lawter was successful in its action against Town & Country, "Transamerica has breached its warranties and agreements by failing to disclose amendments and modifications to the lease and additional agreements between Transamerica and Lawter, which have resulted in additional costs and damages to Town & Country." The complaint sought recovery from Transamerica for any costs, damages or judgments suffered by Town & Country as a result of Lawter's action, as well as reasonable attorney's fees and costs. In its answer, Transamerica affirmatively raised the defense of the statute of limitations with respect to the breach of warranty claim.

In February and March, 1981, Town & Country and Lawter, respectively, filed cross motions for summary judgment. Town & Country's motion was denied, while Lawter's motion was granted. The trial court subsequently entered findings of fact, conclusions of law and its formal judgment. Town & Country's motion for a new trial was denied, giving rise to the first of the two appeals before us.

As concerns Town & Country's third party claim against Transamerica, both parties filed cross motions for summary judgment. Town & Country's motion was denied and Transamerica's was granted. Town & Country filed a motion for new trial, which was granted. Transamerica then filed a notice of appeal giving rise to the second appeal before us.

## TOWN & COUNTRY'S APPEAL

We first address the appeal taken by Town & Country from the trial court's order granting summary judgment in favor of Lawter and denying Town & Country's motion for summary judgment. The trial court concluded that the lease agreement was ambiguous as a matter of law and that, after considering extrinsic evidence, it was established as a matter of law that Lawter's rental obligation under the 1972 lease was $1,566.34 per month. The trial court also concluded that Lawter properly and timely exercised the second of three five-year renewal options. Moreover, the trial court held that, subject to good faith

---

riod for which bills for the service, or rent, are not properly paid by Tenant.

**4.** SECTION 13.3. *Tenant's Share of Costs.* In addition to fixed and percentage rent, Tenant shall pay, upon demand, but no more often than once each calendar month, Tenant's proportionate share ... of all costs and expenses of every kind and nature as may be paid or incurred by Landlord during the Lease Term ... in operating, managing, equipping, lighting, repairing, replacing, and maintaining the common areas, common facilities and related services, and in policing the Shopping Center and affording pro-

tection thereof against fire (if and to the extent that such policing and/or fire protection is provided), as determined in accordance with generally accepted accounting principles and allocated to any particular Lease Year on the accrual method of accounting....

**5.** It appears that the shopping center was actually sold initially to Town & Country Shopping Center, Inc. It was then assigned or sold to Creative II Limited Partnership, which then assigned it to Town & Country, Ltd.

negotiations and agreement, Lawter had the right to exercise a third five-year renewal which, if exercised, would run through December 31, 1990.

■ Town & Country raises several issues pertaining to the trial court's judgment in favor of Lawter. We will discuss each, though not in the order raised by Town & Country. Since we are considering a summary judgment proceeding, we must view the facts and evidence in a light most favorable to the party against whom summary judgment was entered. *Gulf Insurance Company v. Grisham*, 126 Ariz. 123, 613 P.2d 283 (1980); *Matter of Estate of Kerr*, 137 Ariz. 25, 667 P.2d 1351 (App. 1983).

We begin by looking at the lease agreement. As we previously noted, on the first page of the lease entitled "FUNDAMENTAL LEASE PROVISIONS AND EXHIBITS" appears the following: "FIXED ~~MINIMUM~~ RENT: $1,566.34 per month ..." Alongside this clause the parties have initialed, indicating that both recognized deletion of the word "minimum". Thus, the lease provides for a "fixed rent" of $1,566.34 per month. The word "fixed" is defined as: "not subject to change or fluctuation". WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 861 (1969). However, further into the lease, there are clauses providing for adjustment of the rent based upon increases in taxes, utilities or maintenance expenses.[6] Based upon these inconsistencies, the trial court found the lease ambiguous. We agree.

■ The initial determination of whether an agreement is ambiguous, and thus subject to interpretation through the use of parol evidence, is a question of law to be determined in the first instance by the trial court. *Associated Students of the University of Arizona v. Arizona Board of Regents*, 120 Ariz. 100, 584 P.2d 564 (App.1978), *cert. denied* 440 U.S. 913, 99 S.Ct. 1226, 59 L.Ed.2d 462 (1979). However, an appellate court is not bound by the trial court's conclusions of law. The interpretation of an instrument is a question of law to be determined by this court independently of the trial court's determination. *Polk v. Koerner*, 111 Ariz. 493, 533 P.2d 660 (1975); *Associated Students, supra.*

■ An agreement is ambiguous if the language used by the parties can reasonably be construed in more than one sense and such construction cannot be determined within the four corners of the instrument. *Associated Students, supra.* The lease agreement, considered as a whole, does not clearly and unambiguously set forth the rights of the parties as concerns the amount of rent to be paid by Lawter. The lease provides that the monthly rent is fixed at $1,566.34, while it also provides that the rent may be adjusted as the lessor's expenses increase. The lease is not so worded that it can be given a certain or definite meaning or interpretation and is therefore ambiguous. *See Associated Students, supra.*

■ Once a contract is determined to be ambiguous, extrinsic (parol) evidence may be resorted to for the purpose of ascertaining its real meaning. *Associated Students, supra.* Thus, Town & Country's claim that the trial court erred in considering parol evidence fails.

■ Since we have determined that the lease is ambiguous on the point of monthly rent to be paid, it becomes necessary to resolve the ambiguity by considering matters outside the written lease agreement. *Fairway Builders, Inc. v. Malouf Towers Rental Company, Inc.*, 124 Ariz. 242, 603 P.2d 513 (App.1979). Where there is a conflict in the evidence presented to resolve the ambiguity, it is for the trier of fact to resolve the conflict by determining the intent of the parties in executing the instrument. *Fairway Builders, supra; Ash v. Egar*, 25 Ariz.App. 72, 541 P.2d 398 (1975). In such cases, summary judgment is not appropriate. However, where there is no conflict in the evidence presented to resolve the ambiguity, summary judgment

---

**6.** See footnotes 1–4, *supra.*

may be appropriate. *Cf. Fairway Builders, supra.*

 We consider now the evidence presented to resolve the ambiguity. Affidavits of Cecil Lawter, Velma Ludtke, Don Owen and Frank Thurman were before the trial court. Cecil Lawter's affidavit states that he, Velma Ludtke and Don Owen agreed that Lawter's obligation to Transamerica was fixed at $1,566.34 per month. Town & Country claims that Cecil Lawter's affidavit contains statements amounting to "mere conclusions, legal conclusions, opinions and speculative comments, which would not be admissible in a trial." *See* Rule 56(e), Arizona Rules of Civil Procedure. In making its claim, Town & Country cites paragraphs 17, 18 and 29 of Lawter's affidavit.[7] It is true that these paragraphs are couched in terms of Lawter's opinion or conclusion pertaining to the lease agreement and should not have been considered by the trial court in ruling on the summary judgment motion. However, the remainder of Lawter's affidavit from which Lawter draws his legal conclusions and opinions, was properly considered. The remainder of Lawter's affidavit pertains to the intent of the parties at the time the lease was executed. Of particular relevance are paragraphs 14 and 16 which provide:

> 14. Ludtke, Owen and I *were all fully informed and in full agreement* that our school's obligation for all items, including space rent, rental tax, common area maintenance and electricity is fixed at $1,566.34 per month.
>
> * * * * * *
>
> 16. *It was my understanding* and belief *when I signed* the February 14, 1972 lease that "FIXED RENT: $1,566.34 per month" means that our school's obligation for all items is fixed at $1,566.34 per month. (emphasis added)

Velma Ludtke's affidavit states that she, Cecil Lawter and Don Owen had agreed that Lawter would pay a fixed rent of $1,566.34 per month, which included "all charges". Town & Country again makes the claim that the affidavit contains statements amounting to mere conclusions, opinions and speculative comments by citing to paragraphs 19, 20, 21 and 33 of Ludtke's affidavit.[8] We agree that paragraphs 19, 21 and 33 constitute opinions and legal conclusions on the part of Velma Ludtke and should not have been considered by the trial court. However, as with Lawter's affidavit, the remainder of the affidavit was properly considered by the trial court since it pertains to the intent and actions of the parties contemporaneous to execution of the lease. While it is true that Velma Ludtke did not have the sole authority to execute leases or amendments thereto, she did have the authority to negotiate and prepare leases on behalf of Transamerica, and did so in the present case. Both Cecil

---

**7.** 17. In my opinion, "FIXED RENT: $1,566.34 per month" means that our school's obligation, for all items, is fixed at $1,566.34 per month.

18. If the February 14, 1972 lease instrument allows our school to be charged any amount in excess of $1,566.34 per month, the lease instrument is an incorrect documentation of the agreement which was reached between Transamerica and the Cecil Lawter Real Estate School, Inc. through Velma Ludtke, Don Owen and me.

* * * * * *

29. In my opinion, our school is not obligated to pay Town & Country any amount in excess of $1,566.34 per month.

**8.** 19. In my opinion, the February 14, 1972 lease expresses the agreement reached between Transamerica and the Cecil Lawter Real Estate

School, Inc., through Don Owen, Cecil Lawter and me that Lawter's rental, for all items, is fixed at $1,566.34 per month.

20. If the February 14, 1972 lease allows Lawter to be charged any amount in excess of $1,566.34 per month, the written lease was not properly prepared and is an incorrect documentation of the agreement reached between Transamerica and the Lawter School.

21. I recently reviewed the February 14, 1972 lease and firmly believe that "FIXED RENT: $1,566.34 per month" expresses our agreement that Lawter's rent, for all charges, is $1,566.34 per month.

* * * * * *

33. In my opinion, Lawter owes no more than $1,566.34 per month for space rent, rent tax, common area maintenance and electricity.

Lawter and Don Owen have stated in their affidavits that Velma Ludtke was present and participated in the negotiation and execution of the lease. Although she did not have the authority to contractually bind Transamerica, she did join in the execution of the lease as is evidenced by the fact that her signature appears on the lease along with that of Don Owen on behalf of Transamerica.

Paragraph 20 of the affidavit is not defective based upon Ludtke's statement in paragraph 12 that "Lawter, Owen and I agreed that Lawter would pay a fixed monthly rental for all charges, including rental space, common area maintenance and electricity". This, plus the fact that Ludtke affirmed that she had prepared the lease, provides a sufficient basis for her statement in paragraph 20.

The trial court also had before it three affidavits of Transamerica vice president Don Owen. In his second affidavit, dated May 18, 1981, Owen, in addressing the 1972 lease, states:

At no time did I understand nor do I currently understand that Lawter was not required to pay the actual common area expenses, electricity and utility expenses or taxes actually incurred by the landlord and attributable to Lawter as defined in the lease. At no time have I understood that the provisions in the lease regarding taxes as set forth in Article VIII, utility services as set forth in Article XI and common areas, their use and charges as set forth in Article XIII were deleted from the lease.

It can be inferred from the above statement that Owen, when executing the lease, did not intend that Lawter's monthly rent be "fixed" at $1,566.34 but was to be periodically adjusted as the lessor's actual expenses increased. It would appear that Owen's affidavit would conflict with those of Cecil Lawter and Velma Ludtke, thereby presenting a genuine issue of material fact concerning the parties' intent in executing the lease, precluding entry of summary judgment. *See Nicoletti v. Westcor, Inc.*, 131 Ariz. 140, 639 P.2d 330 (1982).

However, a third affidavit executed by Don Owen provides in pertinent part:

I am executing this third Affidavit to clear up any confusion my May 18, 1981 Affidavit may cause. My testimony is:

(a) Velma Ludtke did not have the sole authority to execute leases or amendments thereto. However, Mrs. Ludtke's authority did include the authority to develop clintele [sic], negotiate leases with tenants and prepare leases. She also had the authority to prepare and deliver documents which clarified, rather than amended, lease terms. Documents clarifying lease terms did not require my signature.

(b) I recall spending an hour or more in negotiations with Cecil Lawter and Velma Ludtke to iron out the final details of the February 14, 1972 lease. However, I do not recall the details of our negotiations session.

(c) Any statements in my May 18, 1981 Affidavit as to my understanding of the terms, conditions, agreements or obligations concerning common area expenses, electricity, utilities, taxes or other matters are not based upon actual recollection of fact.

As Town & Country has itself pointed out, Rule 56(e), Arizona Rules of Civil Procedure, requires that affidavits supporting or opposing summary judgment "shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *See Portonova v. Wilkinson*, 128 Ariz. 501, 627 P.2d 232 (1981). Owen in his third affidavit has made it clear that his previous statement concerning execution of the lease is "not based upon actual recollection of fact." Thus he has no personal knowledge of the negotiation or execution of the lease and his opinions or conclusions pertaining to the intent of the parties in executing the lease would not be admissible in evidence. Accordingly, the trial court was required to disregard Owen's previous affidavit as concerns the terms of the lease.

■ Also before the trial court was the affidavit of Frank Thurman. According to his affidavit, Thurman was the common area superintendent at the Town & Country Shopping Center at the time the 1972 lease was executed. Thurman stated that he was regularly ordered by Velma Ludtke to assist Transamerica in determining tenants' monthly utility charges. When a tenant's monthly utility charge was based upon the tenant's monthly usage, he would periodically count the number and sizes of lamps and other electrical appliances used by the tenant and report the finding to Velma Ludtke. Where, however, the monthly utility charge was fixed, he counted and reported only once. Thurman stated that Ms. Ludtke ordered him to make a one-time measurement of Lawter's premises. After performing the measurement, Thurman was never ordered to return to make periodic measurements. Apparently the inference from Thurman's affidavit is that since he did not periodically return to Lawter's premises to measure utility usage, Lawter's monthly utility charge was fixed. While this is certainly a reasonable inference, we are of the opinion that Thurman's affidavit provides little support for Lawter's summary judgment motion. Thurman was obviously not privy to the negotiations or execution of the lease. His actions in only once measuring Lawter's utility usage, at best, corroborate Lawter's claim that its monthly rent is fixed. Thurman's affidavit was nonetheless properly considered by the trial court in ruling on the summary judgment motions.

■ Also before the trial court was a document entitled "AGREEMENT" which reads:

> It is understood and agreed that the *fixed rent* shown on page 1 of the lease effective March 1, 1972, between Cecil Lawter Real Estate School, Inc., and Transamerica Development Company is based on the following:
>
> | | |
> |---|---|
> | Rent (plus sales tax) | $1,333.34 |
> | Common Area | $ 125.00 |
> | Electric | $ 108.00 |
> | Total | $1,566.34 |

(emphasis added). The document is signed by Cecil Lawter and, although a space is provided for the signature of Velma Ludtke on behalf of Transamerica, no other signatures appear on the document.

Town & Country asserts that this document was improperly considered by the trial court in ruling on the summary judgment motions. It is Town & Country's position that consideration of the document violated the parol evidence rule. However, as we have previously noted, the trial court properly concluded that the lease was ambiguous, thereby justifying consideration of parol evidence. Moreover, our Supreme Court has recently held:

> In Arizona ... the interpretation of a negotiated agreement is not limited to the words set forth in the document. Evidence on surrounding circumstances, including negotiation, prior understandings, *subsequent conduct and the like*, is taken to determine the parties' intent with regard to integration of the agreement; once the court is able to decide what constitutes the "agreement," *the evidence may be used to interpret the meaning of the provisions contained in the agreement.* (emphasis added)

*Darner Motor Sales, Inc. v. Universal Underwriters Insurance Group,* 140 Ariz. 383, 393, 682 P.2d 388, 398 (1984).

Additionally, Town & Country argues that since the document was not signed by a representative of Transamerica, it should not have been considered by the trial court. Velma Ludtke's affidavit provides in pertinent part:

> 25. I or, at my request, my secretary prepared the one page document labeled "Agreement" which itemizes the elements of the $1,566.34 monthly fixed rent.
>
> 26. The one page document labeled "Agreement" neither modifies nor varies from our intent and the terms of our agreement but affirms and clarifies the intent of Owen, Lawter and me and the terms of Lawter's February 14, 1972 lease.

27. Documents clarifying lease terms did not require the signatures of representatives of Transamerica's management.

Thus, Ms. Ludtke acknowledges that she either prepared, or had prepared at her direction, the document. She also states that the document does not vary or amend the lease agreement but "clarifies" the agreement of the parties. Finally, Ms. Ludtke asserts that documents clarifying lease terms do not require signatures of management personnel. Don Owen's affidavit verifies Velma Ludtke's authority to "clarify" lease terms: "[Velma Ludtke] also had the authority to prepare and deliver documents which clarified, rather than amended, lease terms. Documents clarifying lease terms did not require my signature." We conclude that the document was properly considered by the trial court to the extent that it represents Velma Ludtke's impression of the agreement reached between herself, Don Owen and Cecil Lawter.

Thus the trial court had before it the affidavits of Cecil Lawter, Don Owen, Velma Ludtke and Frank Thurman, as well as the document purportedly clarifying the lease agreement and the lease agreement itself. Having determined that the lease agreement was ambiguous, the trial court concluded that, based upon the evidence before it, there existed no genuine issue of material fact concerning the intent of the parties in executing the lease agreement. Cecil Lawter and Velma Ludtke negotiated the terms of the lease and both stated unequivocally in their affidavits that the lease rental was "fixed" at $1,566.34 per month and not subject to fluctuation. The document entitled "AGREEMENT" "verified" the agreement reached by Cecil Lawter, Don Owen and Velma Ludtke. Don Owen, in his third affidavit, states that he does not recall the details of his meeting with Cecil Lawter and Velma Ludtke immediately preceding the lease agreement. Thus, all of the evidence before the trial court indicates that the parties intended that the rent be "fixed", rather than subject to fluctuation upwards as Town & Country asserts.

In reviewing the granting of a motion for summary judgment, we must view the evidence in the light most favorable to the party against whom the motion was granted and give such party the benefit of all favorable inferences that may reasonably be drawn therefrom. *Wisener v. State,* 123 Ariz. 148, 598 P.2d 511 (1979); *Brown Wholesale Electric Company v. Safeco Insurance Company of America,* 135 Ariz. 154, 659 P.2d 1299 (App.1982). When the moving party presents sworn proof of specific facts negating the adverse party's assertions, the adverse party must respond with proof of specific facts showing a genuine issue of fact warranting a trial. *Portonova v. Wilkinson, supra.* The response may be in the form of affidavits, or "some other evidence". *Sato v. Van Denburgh,* 123 Ariz. 225, 228, 599 P.2d 181, 184 (1979). However, affidavits not based upon personal knowledge are insufficient to counter sworn statements based upon personal knowledge. *See Portonova v. Wilkinson, supra.* In the absence of controverting evidence, facts alleged by affidavits attached to a motion for summary judgment may be considered true, and if appropriate, summary judgment may be granted. *Portonova v. Wilkinson, supra; Sato v. Van Denburgh, supra.*

Town & Country has presented no *admissible* evidence negating Lawter's claim that the parties intended that the monthly rate was to be fixed at $1,566.34. In light of the sworn affidavits of Cecil Lawter and Velma Ludtke, who negotiated the lease on behalf of Town & Country's predecessor in interest, only one conclusion is possible. Town & Country has failed to present evidence justifying a trial. Therefore the trial court's granting of summary judgment in favor of Lawter on the issue of the amount of monthly rent due under the lease was proper.

Town & Country's reliance on the statute of frauds, A.R.S. § 44–101(6), is misplaced. The affidavits before the trial court were not utilized "to vary or contra-

dict the explicit terms of the lease", but to determine the intent of the parties in executing the lease. The written lease stands, but is reformed to reflect the true intent of the parties.

Town & Country's assertion that Lawter is "bound by the terms of the written lease" also fails. As we previously noted, the lease was ambiguous on the issue of Lawter's monthly rental obligation. A portion of the lease provided that the lease was to be "fixed" at $1,566.34 per month, while certain "boiler plate" provisions provided otherwise. *See Darner Motor Sales, Inc., supra.* Based upon the evidence before the trial court, it properly concluded that the parties intended that the rent be fixed.

■ Town & Country also makes the assertion that it is a bona fide purchaser for value without notice and therefore entitled to enforce the lease as written. Although the lease "as written" is ambiguous on its face, we find it unnecessary to address this argument. This claim was never presented to the trial court prior to Town & Country's motion for new trial and is therefore untimely. Rule 59, Arizona Rules of Civil Procedure, does not provide for the granting of a new trial based upon a newly-devised defense. *See Helena Chemical Company v. Coury Brothers Ranches, Inc.,* 126 Ariz. 448, 616 P.2d 908 (App. 1980).

Town & Country argues that the trial court erred in finding that:

Subject to good faith negotiation and agreement, the Lawter school has the option to extend the school's lease for a fourth five year period extending through December 31, 1990.

The trial court's finding is based upon paragraph 5.6 of the lease, which provides in pertinent part:

Subject to negotiation and mutual agreement, Tenant shall have the option to extend the lease term an additional five years through December 31, 1990.

Town & Country argues that the option clause constitutes, at best, an agreement to

agree and is therefore unenforceable. We agree.

While some jurisdictions have held that option clauses worded similarly to the one now before us are enforceable, *see Moolenaar v. Co-Build Companies, Inc.,* 354 F.Supp. 980 (D.V.I.1973); *State Road Department v. Tampa Bay Theaters, Inc.,* 208 So.2d 485 (Fla.App.1968), most have held such language to be too uncertain and indefinite to be enforceable. *See Joseph Martin, Jr.*, *Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981); *Kaybill Corporation, Inc. v. Cherne,* 24 Ill.App.3d 309, 320 N.E.2d 598 (1974); *Schlusselberg v. Rubin,* 465 S.W.2d 226 (Tex.Civ.App.1971).

■ It is our opinion that an option clause providing that future rent is to be "subject to negotiation and mutual agreement" is too uncertain and indefinite to be enforceable under Arizona law. In *Ripps v. Mueller,* 21 Ariz.App. 159, 517 P.2d 512 (1973), we stated:

In our opinion agreements to make an agreement are not specifically enforceable when material terms are left to future negotiation.

21 Ariz.App. at 160, 517 P.2d at 513. *See also, Cypert v. Holmes,* 81 Ariz. 64, 299 P.2d 650 (1956); *Chu v. Ronstadt,* 17 Ariz. App. 486, 498 P.2d 560 (1972).

■ The interpretation of a contract is a matter of law and not a question of fact. *Hadley v. Southwest Properties, Inc.,* 116 Ariz. 503, 570 P.2d 190 (1977); *Divizio v. Kewin Enterprises, Inc.,* 136 Ariz. 476, 666 P.2d 1085 (App.1983). As an appellate court, we are not bound by the trial court's conclusions of law; the interpretation of an instrument is a question of law to be determined by this court independently. *Polk v. Koerner, supra; Associated Students, supra.*

■ We conclude that the lease agreement does not provide an enforceable renewal option for the period January 1, 1986 through December 31, 1990. That portion of the trial court's judgment providing for a renewal option is reversed.

We find that the trial court did not err in awarding Lawter its attorney's fees. The action clearly arose out of contract and Lawter is the successful party. *See* A.R.S. § 12–341.01(A). Moreover, § 20.3 of the lease provides that "the prevailing party shall be entitled to reasonable attorney's fees." Attorney's fees were properly awarded.

Our disposition of this case necessarily rejects Town & Country's claims that the trial court improperly denied the relief requested in its counterclaim and improperly denied its motion for a new trial.

### TRANSAMERICA'S APPEAL

Transamerica asserts that Town & Country's claim based upon breach of warranty is barred by the statute of limitations. We agree.

Town & Country's warranty claim is based upon paragraph 9(d) of Transamerica's assignment to Town & Country Shopping Center, Inc. which provides: "the Assigned Leasehold is free and clear of all mortgages, liens, encumbrances and tenancies except those shown on Exhibit 'A'." Item 17 of Exhibit "A" noted that the tenant subleases set forth in Exhibit "B" were included as excepted encumbrances. Exhibit "B" listed all of the shopping center tenants as of the date of assignment. The sixth tenant listed was Cecil Lawter Real Estate School. Thus, Town & Country's claim is based upon a covenant against encumbrances. *See Downtown Parking Company, Inc. v. Vorbeck,* 524 P.2d 629 (Colo.App.1974); *see also,* 20 Am. Jur.2d *Covenants, Conditions, Etc.,* § 81 (1965).

A covenant against encumbrances constitutes a covenant *in praesenti* and is breached, if at all, at the moment it is made. *Fechtner v. Lake County Savings and Loan Association,* 66 Ill.2d 128, 5 Ill.Dec. 252, 361 N.E.2d 575 (1977); Thompson on Real Property, § 3183 (1962); *see also, Colonial Capital Corporation v. Smith,* 367 So.2d 490 (Ala.Civ.App.1979); *Cape Company v. Wiebe,* 196 Neb. 204, 241 N.W.2d 830 (1976); *Triplett v. Shield,* 406 S.W.2d 941 (Tex.Civ.App.1966). The covenant is violated at the time the instrument conferring it is delivered. Powell on Real Property, ¶ 898 (1982); Thompson on Real Property, § 3186 (1962).

Therefore, any breach of warranty on the part of Transamerica could only have been made on December 19, 1972, the date of the original assignment. It was on that date that the statute of limitations began to run. Town & Country's third party complaint was filed against Transamerica in August, 1979, more than six and one-half years after the statute of limitations began to run. A.R.S. § 12–550 is applicable and provides that action must be brought within four years after the cause of action accrues. Thus, Town & Country's breach of warranty claim is barred by the statute of limitations.

Town & Country also asserts that Transamerica may be held liable under paragraph 8 of the assignment which provides in pertinent part:

> With respect to said subleases, Assignor shall *indemnify* and hold Assignee harmless *from and against* all loss or damage, including reasonable attorneys' fees, resulting from claims or causes of action *arising prior to the date of recordation of this Assignment;* ... (emphasis added)

It is Town & Country's contention that, by failing to inform Town & Country of the "amendment" of the Lawter lease, Transamerica caused Town & Country to be burdened with an undesirable lease agreement.

As we read the above indemnity provision, it is designed to protect Town & Country from claims of third parties arising prior to their acquisition of the Town & Country shopping center. *See Jacobson v. Crown Zellerbach Corporation,* 273 Or. 15, 539 P.2d 641 (1975). It is not designed to permit Town & Country to seek damages for Transamerica's failure to inform it of an "amendment" to the lease. As the Supreme Court of Oregon noted in *Jacobson, supra:*

If the parties had intended the clause to apply to damages suffered by one party directly from the activity of the other, the provision would have read " * * * *for any claim * * *," rather than "* * * from any claim * * *" (emphasis in original)

539 P.2d at 645.

 Indemnity agreements are construed to cover only those losses or liabilities which reasonably appear to have been intended by the parties. *Shirley v. National Applicators of California, Inc.*, 115 Ariz. 521, 566 P.2d 322 (App.1977); *Barnes v. Lopez*, 25 Ariz.App. 477, 544 P.2d 694 (1976). Town & Country's desired construction of the indemnity provision does not conform to the language of the provision or the law.

Moreover, the indemnity clause applies to "claims or causes of action arising prior to the date of recordation of this assignment". Assuming that Lawter's declaratory judgment action constitutes a "claim or cause of action", it did not arise until Town & Country demanded that Lawter pay increased rent, several years after recordation of the assignment. If Town & Country had not made the demand upon Lawter, no declaratory judgment action would have been filed.

We conclude that Town & Country's claim based upon breach of warranty is barred by the statute of limitations. Furthermore, we find that it may not maintain an action against Transamerica based upon the indemnity provision of the assignment. Therefore we reverse the trial court's order granting Town & Country a new trial.

All parties have requested attorney's fees pursuant to Rule 21(c)(1), Arizona Rules of Civil Appellate Procedure. In the exercise of our discretion, we award Lawter and Transamerica their attorney's fees, the amount of which will be determined upon the filing of the parties' statements of costs. Town & Country's request for attorney's fees is denied.

KLEINSCHMIDT, J., concurs.

HAIRE, Judge, concurring in part; dissenting in part:

I concur in the result reached by the majority in concluding that the lease agreement does not provide an enforceable renewal option for the period extending from January 1, 1986 through December 31, 1990. I also concur in the result reached by the majority in the Transamerica appeal, reversing the trial court's order granting Town and Country's motion for new trial.

For the reasons hereinafter set forth, I do not concur in the majority's affirmance of the granting of summary judgment in favor of Cecil Lawter Real Estate School, Inc., (Lawter), reforming the lease agreement to conform with the lease interpretation advocated by Lawter. In my opinion, the existence of substantial evidentiary conflicts precludes the availability of the summary judgment remedy. The resolution of those conflicts should have been left to a trier of fact.

As a starting point, I agree that arguably there is a conflict in the provisions of the lease. This arguable conflict arises from the striking of the word "minimum" from the phrase "fixed minimum rent" in Article I. From the striking of this one word, Lawter argues that the intent was to nullify the express and unambiguous provisions of Article VIII authorizing additional prorated charges against the tenant in the event of an increase in real estate or rental taxes; Article XI, authorizing future additional prorated charges for utility expenses, and Article XIII, authorizing future additional prorated charges for increased common area expenses.

I have difficulty accepting Lawter's argument. First, I note that in the provisions of § 8.3 (quoted in footnote 3, *supra* ) the original form language of the lease agreement provided that any present or future taxes imposed on the landlord (T & C) measured by the rent payable by the tenant (Lawter) would be paid by the tenant "in addition to and along with the rent otherwise payable hereunder." This form

language was altered by the parties.[9] In its altered form, § 8.3 not only requires that the tenant pay such excise taxes measured by the rent paid by the tenant, but also to pay such taxes as might be thereafter imposed on the landlord by reason of the payment by the tenant to the landlord of "other charges or pro-rations." From the addition of this "other charges or pro-rations" language, an inference can be drawn that the parties contemplated that in the future, payments would be made by the tenant in addition to the fixed rent, specifically payments in the nature of the "other charges and pro-rations" provided for in Article VIII (prorated increase in taxes), Article XI (prorated increase in utility expenses) and in Article XIII (prorated increase in common area expenses). The existence of the initialed alteration also totally refutes Lawter's contention that the provisions were simply "boiler-plate," and not considered binding by the parties to the lease agreement.

Additionally, it is important that the phrase "fixed minimum rent" be considered in its context in Article I of the lease agreement. The lease form is for a shopping center lease and contemplates that the tenant will be a retail sales merchant. Accordingly, the lease contemplates and provides for two categories of rent: A "fixed minimum rent" which might be increased (but not decreased) by a "percentage rent rate" based upon retail sales volume. Since the tenant here, Lawter, is not involved in retail sales, a strong inference can be drawn that the sole reason for the striking of the word "minimum" was to reflect the party's recognition that there was no necessity to establish a "minimum" rent which would be increased by the additional percentage rental.

Notwithstanding the foregoing, I am willing to accept the trial court's and the majority's conclusion that the subject lease agreement is ambiguous. My purpose in making the above observations is to demonstrate that once a determination has been made that the lease agreement is ambiguous and therefore no longer subject to interpretation by the court as a matter of law, conflicts flowing from the various lease provisions and the differing inferences which might be drawn therefrom make the summary judgment remedy inappropriate.

Additionally, I note conflicting inferences which might be drawn from the various exhibits and affidavits which in my opinion likewise preclude the entry of summary judgment. In this dissent I will only mention the inferences which might be drawn by a trier of fact in favor of T & C, the party against whom summary judgment was granted.[10]

The majority mentions an "Agreement" dated February 15, 1972 (one day subsequent to the date of the lease agreement), which breaks down the "fixed rent" into three components: (1) rent, $1,333.34; (2) common area, $125; and (3) electric, $108, totalling $1,566.34, the fixed rent. Assuming the ambiguity of the lease and therefore the admissibility of this "Agreement", an inference could be drawn therefrom in favor of the lease interpretation urged by T & C, since arguably there would be no necessity of a breakdown of the total fixed rent figure into component parts unless it was considered necessary to have a base figure for the common area and electric charge prorations for comparison purposes in the event of a claimed future increase in these prorated expenses.

There was also admitted into evidence a letter dated March 1, 1972, used for trans-

---

9. The alteration is typed in the margin of § 8.3 and the change is initialed by each party.

10. I recognize that this dissent presents a totally slanted view of the evidence and possible inferences therefrom, wholly in favor of the appellant, T & C. I have not mentioned facets of the evidence and possible inferences which might be drawn therefrom which would strongly favor the position of the tenant, Lawter. If the appealed from judgment had been entered after a resolution of the conflicts by a trier of fact, I would not hesitate to affirm. My only quarrel is with the trial court's and the majority's usurpation of the trier of fact's fact-finding function.

mittal of the executed lease agreement to Lawter. In that letter, the landlord stated:

"As we discussed, you may make one check payable monthly for all charges in the total sum of $1,566.34, and I am sure this will make your payment procedures much simpler."

From this language, a similar inference could be drawn that both Lawter and T & C considered the $1,556.34 amount of fixed rent as being a total "of all charges", i.e., $1,333.34 for rent (not subject to change), and $125 for common area charges under Article XIII and $108 for utility charges under Article XI of the lease, each subject to change, and that these separate charges could be totaled in one check for the convenience of the tenant.

The evidence further reveals that for several years after the execution of the lease and until T & C deemed an increase necessary because of increased costs, T & C's monthly rental invoices to Lawter were not for a single figure "rent—$1,556.34", but rather were broken down into a figure for rent, with separate figures for common area and electric expenses. Again, this course of conduct arguably was more consistent with T & C's interpretation of the lease than with that of Lawter.

Additional conflicts and conflicting inferences, as well as credibility issues, are found in the conflicting contents of the various Owen affidavits filed in the trial court summary judgment proceedings. Although none of the Owen affidavits come close to constituting models for utilization in summary judgment proceedings, contrary to the majority's position I do find sufficient admissibility in them to raise substantial factual conflicts in reference to the remedy of reformation allowed by the trial court, and as to the extent of Velma Ludtke's authority as an agent of the original landlord. Additionally, there are permissible conflicting inferences which might be drawn from the Thurman affidavit discussed in the majority opinion. However, since this is a dissent and I have in my opinion already conclusively demonstrated above that summary judgment was improp-

erly entered, I will not further lengthen this dissent with a detailed discussion of the Thurman affidavit and other conflicts which in my opinion also require remand for trial as opposed to summary judgment resolution.

I do, however, find other aspects of the majority opinion sufficiently disturbing to require comment and a further expression of dissent. T & C has objected to the trial court's consideration of certain paragraphs of Lawter's affidavit as amounting to "mere conclusions, legal conclusions, opinions and speculative comments which would not be admissible in a trial." The majority acknowledges that paragraphs 17, 18 and 29 of Lawter's affidavit should not have been considered, but then quotes paragraphs 14 and 16, and finds them admissible as pertaining "to the intent of the parties at the time the lease was executed." In my opinion this conclusion is erroneous and I regret the detrimental impact this conclusion is certain to have on future trial and summary judgment practice in this state. Certainly, evidence of Lawter's intent is relevant once a determination has been made that the lease agreement is ambiguous. However, the Lawter intent which is relevant in proving the lease interpretation advanced by him is not his past or present subjective, unmanifested intent. Rather, the relevant and probative intent is that which is sometimes referred to as his objective intent, manifested by objective acts, words or other conduct at or near the time of the formation of the contract. Lawter's present statement of what his subjective unstated opinions, intent and conclusions were at the time of the negotiations are not admissible in support of Lawter's position.

The foregoing comments are equally applicable to certain paragraphs of the Ludtke affidavit, also attacked by appellant, said paragraphs being quoted in footnote 7 of the majority opinion. In regard to the questioned paragraphs of the Ludtke affidavit, the majority apparently concludes that paragraph 20 is admissible because it "pertains to the intent and actions of the

parties contemporaneous to execution of the lease." For the reasons set forth above, this conclusion by the majority is erroneous, both factually and legally. If the witness has personal knowledge of relevant facts, it is those *facts* which are admissible, not the legal conclusions and opinions which the witness might draw from those facts.[11]

In conclusion, I would reverse the judgment entered in favor of Lawter and remand for a trial on the issues. In view of this remand, I would deny without prejudice the application of both parties for attorney's fees on appeal, delaying such determination pending the ultimate disposition of the remaining issues. Since the litigation between T & C and Transamerica is effectively terminated by the majority's disposition of Transamerica's appeal,[12] I would grant attorney's fees on appeal in favor of Transamerica and against T & C.

---

11. My discussion of the quoted paragraphs of the Lawter and Ludtke affidavits is not intended to indicate any opinion on my part that the trial court erred in considering other parts of the affidavits. Other parts were admissible, and furnish support for the lease interpretation sought by Lawter. It is only because of substantial conflicting inferences created by the lease provisions themselves and by other evidence before the trial court, that I conclude that summary judgment was inappropriate.

12. I have previously indicated my concurrence in the result reached by the majority on Transamerica's appeal.