470 P.2d 696

**KIRKEBY–NATUS CORPORATION, a Maryland corporation, Appellant,**

**v.**

**Irvin KRAMLICH and Dorothy E. Kramlich, his wife, and C. V. Lyman and Rachel Lyman, his wife, Appellees.**

**No. I CA–CIV 902.**

Court of Appeals of Arizona, Division 1, Department B.

June 18, 1970.

Rehearing Denied July 16, 1970.

Review Denied Oct. 6, 1970.

Browder, Gillenwater & Daughton, by Donald Daughton, Phoenix, for appellant.

Biaett & Bahde, by Kenneth Biaett, Phoenix, for appellees.

EUBANK, Presiding Judge.

This case requires construction of a provision inserted into a land purchase trust agreement for "tax purposes." At stake is ownership of a 32 acre parcel which was a portion of the 80 acre trust *res*. Its rightful ownership depends upon whether the provision in question rendered inoperative the "release" provisions in what is widely referred to in Arizona as a "subdivison trust." [1]

The trial judge made findings of fact and conclusions of law holding that the provision in question rendered the release provisions ineffective as to appellant and its predecessors and that the plaintiffs-appellees were entitled to a constructive trust upon and a reconveyance of the 32 acres which the trustee had deeded to appellant. We state the pertinent and supportable facts as we must view them, favorably to appellees' position.

I. For a discussion of the function and nature of release provisions in a subdivision trust, see George Read Carlock, "The Subdivision Trust—A Useful Device in Real Estate Transactions", 5 Arizona Law Review 1 (1963), at pages 4–5.

In 1961, the four appellees and Jack E. Clevenger and his wife held a substantial vendees' interest in an 80 acre tract of desert land in Maricopa County. During that year, they met with representatives of the John F. Long Company, a Phoenix-based corporate subdivider and home-builder, and discussed developing the tract as a residential subdivision. We continue by quoting Finding of Fact No. 4:

"4.) That [appellees and Clevengers] * * * negotiated for the sale of the property * * * with representatives of the John F. Long Company and that as part of the terms of sale so negotiated the owners of the property agreed with the representatives of the John F. Long Company in regard to provisions for the subdividing of the property, the partial release of acreage for part payment, etc. The plaintiffs and Jack E. Clevenger negotiated with the representatives of the John F. Long Company for the sale and purchase of said 80 acres upon representations that the John F. Long Company would be the purchaser and would subdivide and develop said land into a subdivision of homes."

We also quote Finding of Fact No. 5, although it must be qualified as hereinafter indicated:

"5.) That the plaintiffs and Jack E. Clevenger subsequently learned that the purchaser of the property was not to be the John F. Long Company, but instead was to be the Kirkeby Corporation, a Delaware corporation, which was financing the acquisition of the property for the John F. Long Company. The plaintiffs and Jack E. Clevenger first acquired the foregoing information from a letter written by the defendant's attorney, Mr. Richard Snell, to the plaintiffs' attorney, Mr. Dallas Richeson, dated October 5, 1961, which was admitted into evidence in this cause as Exhibit No. 11. This letter contained the terms of an offer to purchase the aforesaid property by the Kirkeby Corporation * * *"

The letter of October 5, 1961 last referred to written by attorney Richard Snell stated that it was written "* * * on behalf of Kirkeby Corporation, a Delaware corporation duly qualified to do business in the State of Arizona ("Buyer"), which has expressed an interest in purchasing such property on the following terms and conditions * * *" The letter makes no mention of the John F. Long Company, or to any previous negotiations concerning the land, and the only link between it and the previous negotiations lies in the fact that one of the meetings between appellees and the representatives of the John F. Long Company took place in Richard Snell's office. The letter does not state that Kirkeby Corporation was financing acquisition of the land for any particular person or entity. To the extent that Finding of Fact No. 5 indicates otherwise it is clearly erroneous. The letter states that the total purchase price for the 80 acre tract would be $320,000, and that Kirkeby Corporation would not assume some $76,000 of "underlying indebtedness" still owed by appellees and Clevengers pursuant to their preexisting trust agreement with others under which they were purchasing the property. Kirkeby Corporation was to make a down payment of $40,000 on the $320,000 purchase price, leaving a "deferred balance" in the amount of $28,000, to be paid off in the future at a rate of $36,000 annually in principal payments, plus interest and taxes. The letter continued:

"4. The aforementioned deferred balance would be evidenced and secured by a subdivision Trust Agreement with Phoenix Title and Trust Company, which, among other things, would provide that (i) * * * (ii) * * * (iii) Buyer would have full release privileges, based on an aggregate release price of $4,025 per gross acre (to be divided between Sellers and the payees of the aforementioned underlying indebtedness in a mutually acceptable manner), (iv) Buyer would have full privileges to cause the property to be subjected to construction mortgages before the re-

lease thereof, subject to the usual 'loan commitment' or deed-in deed-out' restrictions and (v) Buyer would have full privileges to effect 'time sales' in accordance with the usual printed provisions of Section VII of the Phoenix Title and Trust Company form of Trust Agreement. Please be advised that Buyer is interested in obtaining the aforementioned privileges only in connection with a possible resale of the property, since Buyer would be purchasing the property for a long-term investment."

The offer was acceptable to appellees and Clevengers, and a subdivision trust agreement was prepared and executed in December, 1961. In it, appellees and Clevengers are referred to as "First Beneficiaries", and Kirkeby Corporation is referred to as "Second Beneficiary". In order to place the controversial provision here in issue in proper context, it is necessary first to refer to some of the many other detailed provisions of the instrument.

A portion of printed Section III states that "It is agreed that Second Beneficiaries [sic] at their option may cause said property to be subdivided * * *" A portion of Part A under typewritten Section IV states:

"Second Beneficiary shall have the right of prepaying all or any part of any such principal installment at any time without penalty or premium; provided, however, that no more than $54,000 may be so prepaid (whether by payment of release prices pursuant to the provisions of Part C of this Section IV or otherwise) prior to January 1, 1962."

Part C under Section IV are the release provisions of the trust. Part C provides, in part:

"Subject to the provisions of Part E of this Section IV, it is understood and agreed that Second Beneficiary, when it is not in default under this Trust Agreement, may obtain the release from this Trust and from the Pre-existing Trust [under which appellees and Clevengers were purchasing the land] of any of the lots into which the trust property may have been subdivided or any of the unsubdivided portions of the trust property upon payment to the Trustee for the account of First Beneficiaries of the applicable aggregate release price therefor (computed as hereinafter set forth) * * *"

Part D of Section IV permits the Second Beneficiary to place construction loan mortgages on unreleased land. Part E of Section IV, the sole provision to which Part C of Section IV is made expressly subject, provides in effect that the Second Beneficiary could not obtain releases of land or exercise any of the other privileges specified with respect to land unless the First Beneficiaries could do likewise under the terms of the latters' (appellees and Clevengers) pre-existing agreement to purchase the 80 acre tract.

Part G of Section IV is the crucial provision in the case, and the basis of appellees' position. It, like the rest of Section IV, is typewritten. It reads as follows:

"It is understood that all of the trust property is being purchased by Second Beneficiary hereunder for a long-term investment and that Second Beneficiary has no intention of subdividing the trust property or any part thereof. The insertion herein of any provision relating to the subdividing of the trust property, the effecting of partial releases thereof, the obtaining of construction loans thereon or the making of installment sales of portions thereof is intended solely for the purpose of enabling any person to whom any of the trust property may subsequently be sold to take advantage of such provision if he so elects."

This provision is not referred to in any other portion of the Trust Agreement.

All of Section IV of the Trust Agreement was drafted by Richard Snell, Kirkeby Corporation's attorney in the transaction. The trial judge found as a fact that he " * * * did not at any time communicate to the sellers * * * his thoughts in regard to his purpose or intention in the

drafting and insertion of part G of paragraph IV into the Trust Agreement." At the trial, attorney Snell testified that Section IV, Part G (hereinafter "IV(G)") was inserted as an "investment statement", to the ultimate end that any gain realized by Kirkeby Corporation on an eventual sale of the property (or presumably its beneficial interest in the trust) would be taxable as capital gain rather than as ordinary income, which would not be the case if Kirkeby Corporation were to be considered by the federal tax authorities to be a subdivider of or "dealer" in real property. Attorney Snell stated that the provision was intended by him to be " * * * a unilateral statement of Kirkeby Corporation's intentions, a statement, if you will, addressed to the Internal Revenue Service rather than to the other side." It was for this reason, according to his testimony, that the release provisions (Part C of Section IV) were not made subject to IV(G), and that IV(G) commenced with the phrase "It is understood" instead of the phrase "It is understood and agreed", which is used in other provisions which clearly have an operative effect.

It is clear from all of the testimony that IV(G) was not the subject of any negotiations between the parties, and that it was gratuitous as far as the appellees and Clevengers were concerned. None of the testimony introduced by appellees cast any doubt at all on attorney Snell's statement of *his* intention in inserting IV(G) into the trust agreement. In fact, Jack E. Clevenger indicated on cross examination that he knew that IV(G) was a self-serving statement by Kirkeby Corporation, designed to help it *vis a vis* the Internal Revenue Service. Clevenger hastened to add that he also considered IV(G) to be "additional security" to the selling group, because in his view it meant that Kirkeby Corporation could not itself "break up" the 80 acre tract.

Irvin Kramlich, appellees' spokesman in the transaction, testified that he had no knowledge that IV(G) was tax-motivated, and that he took the provision to mean in the context of the previous negotiations with the John F. Long Company that the land would be sold to the Long Company before it was subdivided. Kramlich testified that he would not have signed the trust agreement if IV(G) had not been in it, chiefly because he had no intimate knowledge of Kirkeby Corporation and he had an oral understanding with the representatives of the Long Company that the less valuable interior parts of the tract would be released first, leaving the more valuable exterior parts abutting roads for last release. In considering this testimony, however, it is important to bear in mind that the trust agreement itself makes no reference of any kind to the John F. Long Company, and that the release provisions in the trust agreement give the Second Beneficiary the right to have releases made in any order of "any" subdivided or unsubdivided land within the tract. There was also no evidence to the effect that the John F. Long Company was under any collateral obligation to purchase the land or all or any part of Kirkeby Corporation's beneficial interest in the trust.

Sometime after execution of the instrument, the appellees Kramlich acquired the Clevengers' first or sellers' beneficial interest, after which the appellees Kramlich owned three-quarters and the appellees Lyman one-quarter of the sellers' interest. In May, 1964, Kirkeby Corporation was merged into its corporate parent, Kirkeby-Natus Corporation, a Delaware corporation, which prior to the merger owned all but 115 (one-third of 1%) of Kirkeby Corporation's oustanding common shares. The aforesaid Kirkeby-Natus Corporation was shortly thereafter merged into Kirkeby-Natus Corporation, a Maryland corporation, which is the defendant and appellant herein.

By October 29, 1965, the various Kirkeby companies had made principal payments totaling $160,000 (including the $40,000 down payment) pursuant to the trust agreement, plus interest and all taxes due on the property. On that date, appellant tendered an

additional $800 in principal to the trustee and requested the trustee to release to it a described 32 acre parcel within the 80 acre tract. The trustee, believing that the release provisions were effective, complied with appellant's request, and issued a deed to the 32 acre parcel, which included land fronting upon the adjacent roads at their intersection. Thereafter on November 24, 1965, appellees' attorney Richeson wrote a letter to appellant which states in part:

"It has just come to the attention of the first beneficiaries that the Kirkeby-Natus Corporation requested and received a deed from the trustee for 32 acres comprising the northeast corner of said trust property located at the intersection of Thunderbird Rd. and Tatum Blvd., Maricopa County, Arizona.

"This is to notify you that the release of the 32 acres is in error *since it was understood by the parties to the trust agreement that the first parcel to be released would commence on the west line of the said trust property and that the frontage would be the last to be released.* Therefore, a demand is hereby made that the said 32 acres be deeded back into trust forthwith, and if not so done within ten days from date the necessary legal action will be instigated immediately." (emphasis added)

Some three weeks later appellees commenced the present suit, seeking a constructive trust and reconveyance of the land. The complaint had a dual basis; it alleged that appellant had no right to the release of *any* part of the trust property until the purchase price of the whole tract had been paid in full, and also, echoing the letter quoted immediately above, it alleged that appellant was unjustly enriched by virtue of the location of the particular acreage that was released. At the trial, appellees relied solely on the terms of

IV(G) and its asserted effect on the release provisions, and no evidence was presented on the claim of unjust enrichment. Appellant, in the meantime, ceased making any further payments pursuant to the trust, and its interest in the balance of the land was forfeited in accordance with the terms of the agreement.

The appellees' position has been clearly delineated and well argued both in the trial court and in this court. Their position is, in essence, that IV(G) was reasonably understood by appellees in the context of their previous negotiations with the John F. Long Company to be an integral and operative provision of the trust agreement which by its terms took the effectiveness out of the release provisions of the agreement until such time as the "land" was "sold" by Kirkeby Corporation or its successors in identity and interest. In addition to the strong focus placed by appellees on IV(G), emphasis is placed upon the last sentence quoted from attorney Snell's letter of October 5, 1961, above, which closely parallels IV(G). Considerable reliance is placed upon the principles that doubt as to the meaning or effect of language in a contract will be resolved against the party who is responsible for its use; that the parties to a contract must abide by a common standard of language used; and that the secret, undisclosed, or uncommunicated intention of one party in inserting a provision into a contract will not prevail over a contrary meaning reasonably derived by the opposing party from a fair, objective reading of the provision giving ordinary effect to the terms employed.[2]

As abstract propositions, there can be little quarrel with these and most of the other legal principles cited in the trial judge's conclusions of law. The problem lies in the manner of their application to the instrument and the facts here involved in ar-

2. "The unexpressed understanding of one of the parties to a contract as to its meaning is usually of no legal significance * * * and testimony tending to show secret, undisclosed intention * * * cannot be used to overthrow the effect of the intention actually made manifest in the contract." Bond v. Wiegardt, 36 Wash.2d 41, 216 P.2d 196, 203 (1950), quoted in 4 Williston on Contracts (Third Ed. 1961), § 606, at 375.

riving at an ultimate conclusion that IV(G) carried the day for appellees.

It seems to us that the trial judge reached an erroneous result by focusing too strongly upon IV(G) to the exclusion of the other parts of the trust agreement, and in particular the other provisions in Section IV. " * * * [A] particular clause in a contract cannot be interpreted as if it stood by itself, but the court must take into consideration the entire contract." Miller Cattle Co. v. Mattice, 38 Ariz. 180, 188, 298 P. 640, 642–643 (1931). By the plain terms of Section IV, Part C, the "Second Beneficiary", designated in the instrument itself as Kirkeby Corporation, had the right to effect releases of land, on specified terms, subject only to the provisions of the pre-existing trust agreement under which appellees themselves were acquiring the land. This single expressed limitation on the exercise of the release privilege evokes reference to the maxim "expressio unius est exclusio alterius," particularly since the only Part to which Part C was made subject, Part E, is contained in the same Section as IV(G). Also, it appears from Part A of Section IV, a portion of which is quoted above, that it was contemplated that releases might be effected even prior to January 1, 1962, within a month after the agreement was executed. The release provisions and the other provisions setting forth the Buyer's other privileges are lengthy and detailed, yet apart from IV(G), there is nothing else in the agreement which arguably suggests that the privileges were not to be available to the Second Beneficiary itself as a matter of legal right—whether or not it intended to avail itself of any of the privileges as of the time it entered into the agreement. Had it been the actual intention of the Second Beneficiary to deny itself the legal right to avail itself of the privileges so carefully set forth in Section IV, the whole tenor of Section IV makes it expectable that it would have done so by prefatory or other qualifying language as clear as that which defines the privileges.

When IV(G) is viewed alongside all of the other provisions of the agreement, we are unable to perceive that it is reasonably susceptible of the interpretation which appellees have placed upon it. In the first place, the whole provision is prefaced by a statement of Kirkeby Corporation's motive or purpose in buying the property. While the term "It is understood" ordinarily imports bilaterality, Kirkeby Corporation's motive or purpose would be a matter peculiarly within its own knowledge. And if a maximum effect is given to the imprecise term "long-term investment", it brings Kirkeby Corporation's stated purposes into conflict with appellees' notion that Kirkeby Corporation was merely "wholesaling" the land or temporarily holding it for the near-term use of the Long Company. If, as appellees testified, they believed that Kirkeby Corporation in entering into the transaction was merely acting as an intermediary for the Long Company, then they were put on notice that the first clause in IV(G) was to be taken at something less than full face value. In the second place, while the first sentence of IV(G) refers to "all of the trust property", the second sentence makes reference to "any of the property" which may subsequently be sold. This raises the question of whether "any" part or parts of the land could be effectively "sold" by Kirkeby Corporation prior to its obtaining release of any such part, and if not, why there were any release provisions in the agreement at all, since under appellees' interpretation by the time a vendee from Kirkeby Corporation could exercise the release provisions Kirkeby Corporation would have paid for all of the land in full and the trust agreement would have been fully performed and of no further effect. Thirdly, both sentences in IV(G) are expressed in the language of *intention*, the intention being the unilateral intention of Kirkeby Corporation rather than a statement of mutual intention as to what can or cannot or shall or shall not be done. This is in contrast with the positive right-granting language ("shall", "may")

employed in the other Parts of Section IV and other sections of the trust agreement.

■ It is true that a construction which gives effect to all portions of a contract is to be preferred to an interpretation which leaves one or some parts without effect. See Tyson v. Tyson, 61 Ariz. 329, 149 P.2d 674 (1944). But this principle, like the principle that doubtful language is to be construed against the draftsman, is a secondary rule of contract interpretation. Restatement, Contracts § 236, (1932). It is not a mandate to give an *operative* effect to a provision in a contract which clearly was not intended to have such an effect.

■ It seems to us that the construction given IV(G) in the trial court reflects what appellees wish the contract would have provided rather than the reasonable intendment of the language used. Appellees may very well have thought, as did Jack E. Clevenger who testified for them, that they were dealing with the John F. Long Company. But as a matter of fact, they entered into a written agreement to sell the land to Kirkeby Corporation. Whatever their previous oral understandings were with the representatives of the Long Company, their rights and liabilities with respect to the trust *res* are controlled by all of the detailed terms of the agreement executed by them. As previously stated, that agreement contains no reference to the Long Company, nor does it grant to appellees the protection of release provisions restricted as to the location and order of land to be released, which was a subject of their oral understanding with the Long Company. Appellees seek, in effect, a reformation of the contract executed by them, under the guise of a construction.

There is no restriction in the instrument as to whom the trust property may be "sold" by Kirkeby Corporation, and thus appellees are clearly denied the basic element of protection upon which their construction argument is predicated. That is, appellees throughout their argument assume that the only purchaser to whom Kirk-

eby Corporation could sell the land would have been the John F. Long Company, which in turn would necessarily honor the (apparently parol) representations of its agents with regard to the location and sequence of property to be released. But there is nothing in the actual written agreement entered into by appellees with Kirkeby Corporation which prevented the latter from selling the land to any person, persons, or entity it chose. Even by appellees' construction, therefore, IV(G) gave them only the shadow, rather than the substance, of protection.

Finally it must be noted that the letter of November 24, 1965, written by the attorney who represented appellees in the transaction protesting release of the 32 acres in question made no mention of IV(G) or generally to the position which they have asserted in this litigation. Instead, appellees objected to the release of the 32 acres in question because of their location. We need not determine whether this amounted to a practical construction of the contract by appellees, since the language of IV(G) in the context of the entire agreement determines its construction. It suffices to note that appellees' initial written reaction to the partial release does not support their present position.

We place no stamp of approval on the general practice of placing "unilateral" statements of intention motivated by tax considerations in bilateral (here trilateral) agreements. The potential for confusion is substantial. Still, however complicated the task and great the need for sensitivity the cardinal principle of contract interpretation and the polestar function of courts is to ascertain and give effect to the intention of the contracting parties. Knight v. Metropolitan Life Ins. Co., 103 Ariz. 100, 104, 437 P.2d 416 (1968); 4 Williston on Contracts (Third Ed. 1961), § 601. Here, we think it clear that the agreement entered into by the parties manifested an intent that Kirkeby Corporation would have the legal right to make use of the release provisions set out in Section IV, Part C.

■ Having thus resolved the basic and decisive issue in the case, there is no need for us to consider appellant's further contention ·that the trust property was "sold" when Kirkeby Corporation was merged into Kirkeby-Natus Corporation, a Delaware corporation.[3]

The judgment of the trial court is reversed, and the cause remanded for entry of judgment in favor of appellant.

HAIRE and JACOBSON, JJ., concur.

---

3. While a merger is distinct from a sale of assets and does not effect a sale of corporate property, see Commonwealth v. Wilson Products, Inc., 412 Pa. 78, 194 A.2d 162 (1963), at 166, and authorities cited, the precise question would be whether (assuming another interpretation of IV(G) contrary to that determined above) the term "sold" as used in IV(G) might encompass the kind of transfer which takes place upon a merger.