541 P.2d 398

Paul ASH and Jerome Sonenblick, General Partners in Casa Royale-Casa Espana Apartment Company, a Limited Partnership, Appellants,

v.

Max EGAR and Rebecca Egar, husband and wife, Helyn Brodsky, Ben Welt and Florence Welt, husband and wife, Appellees.

No. 2 CA–CIV 1842.

Court of Appeals of Arizona, Division 2.

Oct. 17, 1975.

Rehearing Denied Nov. 26, 1975.

Review Denied Dec. 16, 1975.

Miller, Pitt & Feldman, P. C. by David J. Leonard, Tucson, for appellants.

Lesher, Kimble, Rucker & Lindamood, P. C. by Robert O. Lesher, Tucson, for appellees.

OPINION

HOWARD, Chief Judge.

This case involves the interpretation of two 99-year leases on two parcels of land upon which apartment buildings were constructed by appellants. Appellees are the owners-lessors of the land.

The dispute revolves around paragraph 13 of the lease agreements. Paragraph 13(f) provides:[1]

"(f) Landlord's interest in the demised premises shall not be subordinated to any loan or loans secured by a mortgage where such loan is to replace original mortgage financing or to refinance original mortgage financing other than interim construction financing, UNLESS: (1) The other provisions of this Article are complied with, (2) Such new loan is procured for the purpose of refinancing or replacing the original loan, (3) Such new loan is procured to provide funds for remodeling or new improvements, or (4) Unless such new loan is procured to construct improvements after such time as original improvements become obsolete, or original improvements are demolished and new improvements erected, but in no event shall original improvements be demolished before June 1, 1988."

The trial court in deciding in appellees' favor made findings of fact among which were the following:

"8. Paragraph 13 of the lease agreements listed the only purposes for which the loans, to be secured by mortgages to which defendants would be required to subordinate their interests, could be used.

9. Paragraph 13 of the lease agreements was intended to provide and did provide that any loan secured by a mortgage to which defendants would be required to subordinate their interests would both

(a) meet the requirements of subparagraphs (a) and (b) of Paragraph 13, and

(b) be for one of the three purposes defined in subparagraphs (2), (3) and (4) of subparagraph (f) of Paragraph 13.

10. The purposes for which a loan could be used if it were to be secured by a mortgage to which defendants would be required to subordinate their interests were those purposes listed in subparagraphs (2), (3) and (4) of subparagraph (f) of Paragraph 13, and no others.

11. The purposes for which the loans to be secured by the mortgages to which plaintiffs demanded that defendants subordinate their interests were to be used included purposes not listed or permitted in Paragraph 13."

In January of 1970, appellants procured an original mortgage on the properties and improvements for $800,000. This money was used to construct the apartments. In the spring of 1973, there was $780,000 remaining to be paid on the mortgage. Pursuant to the lease[2] which allowed a mortgage to be placed on the property in a sum not to exceed 70% of the then-appraised value, appellants had the properties reappraised and secured a commitment from a lending institution to lend the sum of $1,000,000 which was somewhat less than the 70% of the then-appraised value of the properties.

The purpose of the new loan and mortgage was to release capital to appellants' investors. The $1,000,000 was to be applied as follows: $780,000 to pay off the original mortgage and the balance of $220,000 less $4,400 in "points" to be distributed to the original investors who had originally invested $265,000 in the properties. A very small sum was to be kept on hand for remodeling.

Appellants wrote a letter to appellees requesting them to subordinate their interest in the property, pursuant to Article 13(f) of the lease, to the new mortgage. When they refused to do so, appellants filed this action for declaratory judgment and damages.

Both parties agreed at trial that subparagraphs 2, 3 and 4 of Paragraph 13(f) are to be read in the disjunctive and not the

---

1. The trial court also based its decision on its interpretation of Article 13(b). We need not discuss this provision in view of our disposition and reasoning.

2. We use the term in the singular since the essential provisions of both leases are identical.

conjunctive. Their disagreement centers on Paragraph 13(f)(2), which requires subordination only if "Such new loan is procured for the *purpose of refinancing* or replacing the original loan." (Emphasis added)

It is appellants' contention that the term "refinancing the original mortgage" means that a new mortgage can be placed on the properties in an amount based upon the current appraised value of the properties and not limited by the amount of the original loan.

Appellees' position is that when Paragraph 13(f) is read as a whole, it is evident that under Paragraph 13(f)(2) the new mortgage can either be in an amount which does not exceed the original loan (refinancing) or in the amount of the balance of the original loan (replacing).

To aid the court in interpreting the disputed provision, extrinsic evidence was introduced. Appellants produced the testimony of two persons who were "experts" in the mortgage loan field to explain the term "refinancing." The one deduction that can be made from their testimony is that the term has no special meaning, custom or usage, and is not a word of art. As one of the witnesses said, "I would expect anybody to comprehend the word 'refinancing.'" Both witnesses testified that the term "refinancing" did not imply any limitation on the amount of the loan. At this point we observe that the issue is not what the term "refinancing" means but rather what does that term mean in the context of the lease agreement?

Mr. Sonenblick testified as to conversations with Mr. Schorr, the attorney for Mr. Brodsky, who subsequently acquiesced and with Mr. Brodsky himself. After testifying that the drafts of the lease were composed by both Schorr and himself, he stated:

"A. I told Mr. Schorr that I objected to the provision [on subordination] because it provided that at some later time when the tenants ground lease if he were to refinance, as I recall the testimony, provided we could not refinance, beyond the then original balance. If it had been reduced from $800,000 to $400,000, we could only go out and get a new $400,000 loan. We couldn't even build it back up to $800,000 and I said, 'This is intolerable.' So, I left his office and I talked to Mr. Ash and I said to him—

Q. Not here your testimony about the conversation with Ash. Did you then have a conversation with Schorr again or with Brodsky about that?

A. I then had a conversation with Mr. Brodsky.

Q. How long after the Schorr conversation?

A. Probably within a week.

* * * * * *

Q. Would you relate that conversation?

A. I told Mr. Brodsky, I said, 'Mr. Schorr is taking a very inflexible position. You are a developer of property Irving, and you understand the position of a developer.' He said, 'Yes.' and I said, 'Irving, you know what we have to do from time to time. From time to time, as is normal, you have to refinance property mortgaging up properties go up,' and he said, 'Jerry, I will talk to Mr. Schorr and straighten it out.' He said, 'You know there is two protections I have to have. The first protection is I will not allow the interest rate to go over 8 and ¾ percent. I don't want you placing a 10 or 11 or 12 percent mortgage on the property. That is too high and excessive, and it can hurt our security.' I said, 'Well, Irving, that is fine. As you know, we are talking about an 8 and ½ percent loan now.' I said—he said he understood that. 'What else,' he said, 'I must have that protection that you don't get over 70 percent to market value ratio. I must have that 30 percent gap to protect our lease hold position.' And I said, 'Both of those Irving are very reasonable and unfortunately, it just doesn't stand up. He is taking an overprotective position,' and Irving said,

'Look, I understand.' And he said, 'I will go back and see Sy and work it out.'

Q. Did you have any subsequent conversation with either Mr. Brodsky or Sy Schorr about that point?

A. Yes.

Q. Who was the next person?

A. The next meeting was with Mr. Schorr, I believe it was in his office again shortly thereafter.

Q. Were the two of you alone?

A. Yes. The two of us were alone.

\*     \*     \*     \*     \*     \*

A. (By the witness): I [Mr. Schorr] am against it but if this is what you and Mr. Brodsky worked out, then I will go along with it and we subsequently drafted Article 13 as you now know it."

Mr. Sonenblick also explained to the trial court the desirability of having a subordination provision in a long term lease which would allow the tenant to secure a new mortgage subject to subordination with a lower interest rate. He also stated that it would be difficult to sell a leasehold interest in a situation such as this if the refinancing was limited to the balance due on the original mortgage.

Both parties at trial maintained that the provisions in question were clear and unambiguous. The purpose of appellants' extrinsic evidence was ostensibly to show that there was no ambiguity. It is clear to us, however, that the contract is ambiguous in that subparagraphs (3) and (4) of Paragraph 13(f) have no meaning or purpose if subparagraph (2) is literally interpreted. In other words, why have the limitations in subparagraphs (3) and (4) if one can refinance based upon the current appraisal value of the property?

Interpretation of a contract is a question of law for the court when its terms are unambiguous on its face; but if there are ambiguities and it is necessary to consider the circumstances in determin-

ing its meaning, it is a question for the trier of fact to determine what those circumstances were. *Ridara Livestock Co. v. Agricultural Products Co.,* 61 Ariz. 473, 150 P.2d 761 (1944).

The previously quoted testimony of Mr. Sonenblick shows that at one time the refinancing provision was very restrictive and only allowed refinancing based upon the current balance of the mortgage. Sonenblick objected to this and it was changed. Sonenblick's testimony is, however, consistent with appellees' contention that the refinancing is limited to the original total amount of the old mortgage.

Whether one considers the findings of the trial court conclusions of fact not to be disturbed unless clearly erroneous, or whether they are considered conclusions of law which are not binding on this court, the result in this case is the same.

The rule of interpretation set forth by Williston on Contracts and quoted with approval in *Kintner v. Wolfe,* 102 Ariz. 164, 167, 426 P.2d 798 (1967) applies:

"The cardinal rule of construction to be applied in the interpretation of contracts is to ascertain the intention of the parties. One of the principal phases of such consideration is to arrive at the meaning the parties themselves attached to the words and phrases used in the contract to express their intention. \* \* \* 'Words generally bear their usual and common signification' \* \* \*. *The writing will be read as a whole, and every part will be interpreted with reference to the whole;* \* \* \* The circumstances under which a writing was made may always be shown. \* \* \* all the surrounding circumstances at that time necessarily throw light upon the meaning of the contract." Williston on Contracts, 3rd Ed. Vol. 4, Sec. 618 (Emphasis added)

In interpreting the meaning of the words in subparagraph (2), they should not

**76**

be considered apart from other provisions which may throw light upon their meaning. *Tevis v. Ryan,* 13 Ariz. 120, 108 P. 461 (1910). The lease must be construed as a whole and the intentions of the parties thereto must be collected from the entire instrument and not from detached portions. *O'Malley Investment & Realty Co. v. Trimble,* 5 Ariz.App. 10, 422 P.2d 740 (1967); *Hiett v. Howard,* 17 Ariz.App. 1, 494 P.2d 1347 (1972).

■ A written contract will, if possible, be construed so as to give effect to all its parts. *Babbitt Bros. Trading Co. v. Marley,* 28 Ariz. 589, 238 P. 392 (1925); *Kreig v. Hammels,* 29 Ariz. 280, 240 P. 1031 (1925); *Graver Tank & Mfg. Co v. Fluor Corp. Ltd.,* 4 Ariz.App. 476, 421 P.2d 909 (1966).

■ When subparagraphs (2), (3) and (4) of Paragraph 13(f) are read together, it is clear the parties intended that there be no subordination by the appellees unless the funds from the mortgage were used on the properties themselves, or, unless the mortgage did not exceed the total amount of the original mortgage.

■ Appellants also contend the court erred in its ruling on their motion to compel discovery. During the taking of Mr. Schorr's deposition, appellees' counsel prevented Mr. Schorr from answering questions concerning what Mr. Schorr intended Paragraph 13(f)(2) to mean. Standing alone, Mr. Schorr's intent is not relevant. It is relevant in his position as the attorney for Brodsky because as such it reflects the intent of Brodsky, whose intent could only have come to Schorr by means of a communication to him by Brodsky. Appellants' questions thus ran afoul of the attorney-client privilege and the court did not err in refusing to compel Mr. Schorr to answer the questions.

Judgment affirmed.

KRUCKER and HATHAWAY, JJ., concur.