52 P.3d 786

TENET HEALTHSYSTEM TGH, INC., an Arizona corporation; Tenet Healthsystem WRF, Inc., an Arizona corporation, Plaintiffs/Appellants,

v.

Richard A. SILVER and Margot N. Silver, husband and wife; Tucson Orthopaedic and Fracture Surgery, P.C., an Arizona corporation, Defendants/Appellees.

No. 2 CA–CV 2001–0172.

Court of Appeals of Arizona.

Aug. 27, 2002.

Lewis & Roca, LLP, by Rob Charles, Patricia K. Norris, Kristin M. Page, Tucson, for plaintiffs/appellants.

Law Offices of Dennis A. Rosen, by Dennis A. Rosen, Gayle D. Reay, Tucson, for defendants/appellees.

## OPINION

ESPINOSA, Chief Judge.

¶ 1 This appeal arises from an action for breach of a guaranty executed by defendants Tucson Orthopaedic and Fracture Surgery, P.C., and Richard and Margot Silver (collectively, the Silvers) in favor of plaintiffs Tenet HealthSystem TGH, Inc., and Tenet Health-System WRF, Inc. (collectively, Tenet). The trial court granted the Silvers' motion for partial summary judgment in Tenet's action to enforce the guaranty and entered judgment pursuant to Rule 54(b), Ariz.R.Civ.P., 16 A.R.S., Pt. 2. On appeal, Tenet contends the trial court erroneously found that Tenet's credit purchase of the secured property at a trustee's sale extinguished the Silvers' liability and erred by denying Tenet's application for a writ of attachment on property the Silvers owned and by awarding them attorney's fees. We agree and reverse.

## Background

¶ 2 We view the facts of this case in the light most favorable to Tenet, the party opposing summary judgment. *Nestle Ice Cream Co. v. Fuller*, 186 Ariz. 521, 924 P.2d 1040 (App.1996). Tenet owned former Tucson General Hospital and, in December 1999, agreed to sell it to Tucson Clinical Care (TCC). As part of the transaction, TCC executed a $7 million promissory note as part of the purchase price, due in sixty days and secured by a deed of trust on the hospital. At the same time, the Silvers guaranteed $1.5 million of TCC's obligation to Tenet under the note and several other agreements. The guaranty agreement provided, in part:

2. [The Silvers] guarantee[ ] that if [TCC] does not timely perform or pay [the note] ... in full when due, [the] Silver[s] shall, upon demand by [Tenet], forthwith satisfy [the note].... *[The Silvers'] liability under this Agreement shall continue until and only until payment of One Million Dollars ... or more has been made on the outstanding principal balance of the Note.* This Agreement is a guaranty of due and punctual performance and payment and is not merely a guarantee of collection.

3. [The Silvers] hereby:

(a) Consent[ ] that [Tenet] may, without affecting the enforceability or effectiveness of this Agreement ... and without affecting ... the liability of [the Silvers], ... at any time ... and without notice or demand ...:

(i) Waive or delay the exercise of any of its rights or remedies against [TCC] or any other person or entity;

. . . .

(iv) Apply payments by [TCC], the [Silvers], or any other person or entity to the Guaranteed Obligations; and

(b) Waive[ ] all notices whatsoever with respect to this Agreement....

4. The liability of [the Silvers] under this Agreement is absolute, unconditional and irrevocable, without regard to the liability of any other guarantor[ ] and shall not in any manner be affected by reason of any action taken or not taken by [Tenet], which action or inaction is herein consented and agreed to, nor by the partial or complete unenforceability or invalidity of any other guaranty or surety agreement.... All of [Tenet's] rights and remedies shall be cumulative....

....

7. [Tenet] may bring and prosecute a separate action or actions against [the Silvers] whether or not [TCC], any other guarantor, or any other person is joined in any such action or a separate action or actions are brought against [TCC], any other guarantor, or any other person for all or any part of the [note]....

(Underlining in original.)

¶ 3 TCC failed to make the first principal payment of $1 million, due January 10, 2000. On January 11, Tenet demanded payment from TCC and notified the Silvers of TCC's default. Ten days later, Tenet demanded payment from the Silvers. In February, because no payment had been made, Tenet filed this suit against TCC on the note and against the Silvers and other guarantors, who had guaranteed an additional $3.5 million of TCC's obligation, on their guaranties.[1] In September, Tenet filed a motion for partial summary judgment against the Silvers, arguing that their liability was fixed by the guaranty. The Silvers filed a cross-motion for summary judgment, arguing their obligation had been extinguished because Tenet had recently given notice of a trustee's sale of the hospital property, the value of which exceeded the Silvers' discharge limit of $1 million.

¶ 4 In October, TCC filed a petition in the United States District Court under Chapter 11 of the United States Bankruptcy Code. The trial court ruled that the automatic stay resulting from the filing of the petition pre-vented it from ruling on the parties' summary judgment motions. See 11 U.S.C. § 362(a). The stay was lifted in February 2001, and Tenet proceeded with its deed of trust sale, at which Tenet purchased the hospital with its credit bid of $4.6 million. Tenet later sold the hospital for that amount. As a result, the Silvers supplemented their cross-motion for summary judgment, contending that their "obligation ha[d] been satisfied." The trial court agreed and entered partial summary judgment in their favor. This appeal by Tenet followed.

### Standard of Review

¶ 5 On appeal from summary judgment, we review *de novo* whether the trial court correctly applied the law. *Hahn v. Pima County*, 200 Ariz. 167, 24 P.3d 614 (App.2001). Contract and statutory interpretation issues are questions of law subject to our *de novo* review. *Bothell v. Two Point Acres, Inc.*, 192 Ariz. 313, 965 P.2d 47 (App. 1998) (interpretation of release provision); *Hartford Accident & Indem. Co. v. Federal Ins. Co.*, 172 Ariz. 104, 834 P.2d 827 (App. 1992) (statutory interpretation).

### The Silvers' Guaranty

¶ 6 We first address whether, as the Silvers argued and the trial court implicitly found, the proceeds Tenet received from the sale of the hospital extinguished the Silvers' liability under the guaranty. Tenet argues that, under the terms of the guaranty agreement, a partial principal payment could cancel the Silvers' liability only if timely and voluntarily made. The Silvers counter that any partial principal payment in excess of $1 million, including an involuntary one by trustee's sale or foreclosure, extinguishes their liability.

¶ 7 The nature and extent of a guarantor's liability depends upon the terms of the guaranty contract. *Provident Nat'l Assurance Co. v. Sbrocca*, 180 Ariz. 464, 885 P.2d 152 (App.1994). As with any question of contract interpretation, our goal is to effectuate the parties' intent, giving effect to the contract in its entirety. *Id.; see also*

---

**1.** Neither TCC nor the other loan guarantors are     parties to this appeal.

*Taylor v. State Farm Mut. Auto. Ins. Co.,* 175 Ariz. 148, 854 P.2d 1134 (1993). And, although we generally construe a guaranty to limit a guarantor's liability, we must give effect to its clear and unambiguous terms. *Consolidated Roofing & Supply Co. v. Grimm,* 140 Ariz. 452, 682 P.2d 457 (App. 1984). Neither party contends the guaranty is ambiguous; they merely suggest alternate interpretations. *See Millar v. State Farm Fire & Cas. Co.,* 167 Ariz. 93, 96, 804·P.2d 822, 825 (App.1990) (a contractual term "is not ambiguous ... merely because one party assigns a different meaning to it in accordance with his or her own interest"); *see also Taylor.*

¶ 8 Preliminarily, we disagree with the Silvers that this case presents an issue that can be resolved by A.R.S. § 33-814(C). That statute provides in part: "If ... a trustee's sale is held, the liability of a person who is not a trustor for the deficiency is determined pursuant to subsection A of this section and any judgment for the deficiency against the person shall be reduced in accordance with subsection A of this section." As anticipated by that subsection, the deficiency judgment against the principal debtor "shall be for an amount equal to the sum of the total amount owed the beneficiary as of the date of the sale, as determined by the court less ... the sale price at the trustee's sale." § 33–814(A). Although we agree with the Silvers that § 33–814 requires reduction of the principal amount due, the statute does not address whether the sale price of a property at a trustee's sale necessarily extinguishes a guarantor's liability like that of the Silvers under the guaranty here.

¶ 9 The guaranty clearly recites that the Silvers "agreed to execute" it "as an inducement to [Tenet] to execute the Sale Agreement and to close the transactions contemplated by the Sale Agreement." Under the guaranty, the Silvers would be liable for $1.5 million "until payment of One Million Dollars ... or more has been made on the outstanding principal balance of the Note," and they expressly acknowledged their guaranty was one of "due and punctual performance." As noted earlier, Tenet simultaneously filed actions against TCC on the promissory note and against the guarantors on their respective guaranties before giving notice of a trustee's sale of the property and, until the sale occurred and the hospital was sold, no principal payment had been made on the note. The question, then, is what effect application of the post-default proceeds should have on the Silvers' liability, which in turn depends on the parties' discernable intent in executing the guaranty. *See Taylor.*

¶ 10 Contrary to the guaranty's express provision that the Silvers had induced Tenet to sell the hospital to TCC by assuring TCC's "performance" up to the discharge amount, the Silvers' interpretation suggests that the parties intended to allow Tenet to collect on the Silvers' guaranty only if it could not recover at least the amount of the Silvers' discharge limit through a trustee's sale or foreclosure proceedings. In effect, the Silvers contend that the parties intended that their agreement be a secondary, and perhaps a tertiary, *guaranty of collection* of only the first $1 million of the underlying obligation. But this contravenes the express language of the guaranty: "This Agreement is a guaranty of *due and punctual performance and payment* and is not merely a guarantee [sic] of collection." (Emphasis added.) As other language in the guaranty declares, the Silvers agreed their liability was "absolute, unconditional and irrevocable," language indicative not of a guaranty of collection, but a guaranty of payment. *See AMA Management Corp. v. Strasburger,* 309 S.C. 213, 420 S.E.2d 868, 872 (App.1992) (a guaranty of payment "is an absolute or unconditional promise to pay a particular debt if it is not paid by the debtor" at the time it is due); *CIT Fin. Servs. v. Herb's Indoor RV Center, Inc.,* 118 Idaho 185, 795 P.2d 890, 892 (App. 1990) ("An unconditional guaranty is a promise by the guarantor to pay the debt or perform the obligation upon default without requiring the secured party to first exhaust its remedies against the [principal obligor]."); Restatement (Third) of Suretyship and Guaranty § 15(b) cmt. d (1995) ("In the absence of language or circumstance indicating the contrary [such as the obligation's express designation as a guaranty of collection], the secondary obligation is the agreement of [the guarantor] to be jointly and severally liable

for the [principal obligor's breach]...."). A guaranty of collection, on the other hand, permits a creditor to collect from a guarantor only if the principal obligor is insolvent or cannot otherwise pay the underlying obligation. Restatement § 15(b).

¶ 11 We agree with Tenet that the Silvers' interpretation would vitiate the guaranty of payment provision and thereby render the agreement substantially meaningless, if not illusory. Such an interpretation conflicts with some of our most fundamental rules of contract interpretation. *See Ash v. Egar,* 25 Ariz.App. 72, 76, 541 P.2d 398, 402 (1975) ("A written contract will, if possible, be construed so as to give effect to all its parts."); *Kirkeby–Natus Corp. v. Kramlich,* 12 Ariz.App. 376, 382, 470 P.2d 696, 702 (1970) ("It is true that a construction which gives effect to all portions of a contract is to be preferred to an interpretation which leaves one or some parts without effect."). Their interpretation also vitiates the guaranty's language that the Silvers promised "due and punctual performance" of their obligation because it would make their liability contingent on Tenet's subsequent actions despite the fact that the Silvers' liability was already triggered under the express terms of the agreement.

¶ 12 The guaranty makes clear the parties executed it contemplating not only TCC's potential inability to make its scheduled principal payments but also, because the guaranty covered several of TCC's obligations in addition to the purchase money note, the possibility that a trustee's sale might generate insufficient funds to fully repay TCC's obligation. Under section seven of the guaranty, the Silvers expressly acknowledged that Tenet's recourse was not limited to an action against TCC or the other guarantors. Moreover, the Silvers agreed in section four that their guaranty was only one of Tenet's several possible remedies. Taken together, the terms of the agreement show that the parties intended that the Silvers' liability would attach upon TCC's default.

¶ 13 The Silvers' argument to the contrary ignores other plain language of the guaranty as well, including the covenants that they consented to "any action taken or not taken" by Tenet and that, under section three of the agreement, payment from any other source would not affect their liability. The Silvers cite no authority for the proposition that, "[o]nce Tenet decided to complete its Trustee's Sale, before obtaining a judgment against Silver, the provisions of the Guaranty Agreement were no longer applicable." Indeed, the guaranty's terms, read together, reflect that the only nonapplicable provision following TCC's default was the discharge provision. Because the record shows that TCC defaulted on the loan before $1 million of the underlying obligation had been paid, the Silvers' liability under the guaranty attached without qualification when Tenet demanded payment from the Silvers. *See Bank of America Nat'l Trust & Sav. Ass'n v. Schulson,* 305 Ill.App.3d 941, 239 Ill.Dec. 462, 714 N.E.2d 20 (1999). We will not adopt a different interpretation of the guaranty unless the parties clearly made such an agreement. *Provident Nat'l Assurance Co.*

¶ 14 Although we have found no Arizona cases directly on point, other jurisdictions that have considered guaranties containing language similar to the one at issue in this context have held that the guarantor remains bound despite the application of trustee's sale or foreclosure proceeds. The most recent case so holding is *Schulson.* There, the defendants guaranteed a $13.5 million loan Bank of America had made to the defendants' limited partnership. The guaranties provided that each defendant "unconditionally guarantee[d] the full and prompt payment when due" of the debtor's obligations, at an amount not to exceed $3 million, but "reduced by an amount equal to 36% of any principal payments made with respect to the Liabilities." *Id.* 239 Ill.Dec. 462, 714 N.E.2d at 22, 23. After the debtor defaulted, the bank sent each guarantor a notice of the debtor's default and demanded payment under the guaranties, then filed a lawsuit against them when they refused to pay. The debtor filed a voluntary bankruptcy petition, which eventually resulted in the sale of its collateral for about $8 million. In counterclaims, the guarantors sought declarations that their liability was reduced by application of the collateral proceeds. The bank op-

posed the counterclaims and moved for summary judgment, which the trial court denied.

¶ 15 The Appellate Court of Illinois reversed the judgment on that issue, finding that the guaranties reflected the parties' intent that the guarantors' "obligations [we]re triggered upon the debtor's default." *Id.* 239 Ill.Dec. 462, 714 N.E.2d at 27. In reaching its decision, the court recognized, as we do here, that the guarantors' interpretation would nullify specific guaranty provisions, including the guarantors' promise to provide " 'full and prompt payment' " upon the debtor's default. *Id.* 239 Ill.Dec. 462, 714 N.E.2d at 25. The court also found that the guaranties' use of the terms " 'absolute' " and " 'unconditional' " made it comparable to a guaranty of payment, *id.* 239 Ill.Dec. 462, 714 N.E.2d at 26, under which a creditor is not required to collect from the debtor or on the collateral before enforcing the guaranty.

¶ 16 Although we recognize, as the dissent suggests, that an ongoing borrowing relationship probably existed between the debtor and creditor in *Schulson,* we believe the dissent unduly emphasizes that factual aspect. It is notable that the *Schulson* court made no distinction between that case and a case on which it relied, *Telegraph Savings & Loan Ass'n v. Guaranty Bank & Trust Co.,* 67 Ill.App.3d 790, 24 Ill.Dec. 330, 385 N.E.2d 97 (1978), in which there is no indication the debtor and creditor had an ongoing borrowing relationship. The *Schulson* court nevertheless followed *Telegraph Savings & Loan* in holding that, because the guaranties at issue showed the parties had intended that only voluntary payments could release the guarantors, collateral proceeds were not "principal payments" for the purposes of release. 239 Ill.Dec. 462, 714 N.E.2d at 26.

¶ 17 Other courts have reached the same conclusion on agreements similar to the ones at issue in *Schulson, Telegraph Savings & Loan,* and here. *See, e.g., MacCulley v. Fidelity Federal Savings & Loan Ass'n of Ocala,* 335 So.2d 327 (Fla.App.1976); *TMG Life Ins. Co. v. Ashner,* 21 Kan.App.2d 234, 898 P.2d 1145 (1995); *Southern Bank & Trust Co. v. Harley,* 292 S.C. 340, 356 S.E.2d 410 (App.1987), *aff'd as modified,* 295 S.C. 423, 368 S.E.2d 908 (1988); *Preston Ridge Fin. Servs. Corp. v. Tyler,* 796 S.W.2d 772 (Tex. App.1990); *Crown Life Ins. Co. v. LaBonte,* 111 Wis.2d 26, 330 N.W.2d 201 (1983); *cf. BankEast v. Michalenoick,* 138 N.H. 367, 639 A.2d 272, 273 (1994) (foreclosure sale proceeds applied first to extinguish guaranty, which provided: " 'This guarantee shall be reduced to the extent of any principal paydown on the Obligations.' ").

¶ 18 In sum, Tenet's actions to recover the debt did not affect the Silvers' liability because they had executed a guaranty of "due and punctual" payment and "not merely a guarantee [sic] of collection." *See LaBonte.* The record shows Tenet complied with its contractual obligation to initially demand payment from TCC upon its default. Once Tenet had done so and demanded payment from the Silvers, their guaranty obligation was fixed. *See Schulson; LaBonte.* Their subsequent refusal to perform promptly and the delay caused by this action do not extinguish their liability. We accordingly reverse the grant of summary judgment in favor of the Silvers and remand this matter to the trial court with directions to enter partial summary judgment in favor of Tenet.[2]

### Writ of Attachment

¶ 19 Relying on the guaranty, Tenet applied for a writ of attachment in September 2000 against the Silvers' property. After a hearing, the trial court declined to issue the writ, finding that TCC's underlying obligation was "fully secured." The court later awarded the Silvers attorney's fees. Tenet contends both orders are erroneous.

¶ 20 A trial court may issue writs of attachment in a contract action only if the debt "is not fully secured by real or personal property." A.R.S. § 12–1521(1). Although the Silvers' guaranty was unsecured, they ask us to uphold the trial court's orders because Tenet's deed of trust securing the principal debt would have generated sufficient funds to secure the guaranty. But the Silvers ignore a basic principle of a guaranty:

2. We note that while the maximum amount of the Silvers' liability was fixed by their breach, the amount they actually pay, of course, may or may not be the full amount of the guaranty.

it is an agreement separate from the principal debt. *Howard v. Associated Grocers,* 123 Ariz. 593, 601 P.2d 593 (1979); *Provident Nat'l Assurance Co.* Moreover, the Silvers again ignore the purpose and language of the guaranty, that, as guarantors, their liability would not be subject to Tenet's ability to recover its losses through a trustee's sale of foreclosure. In light of this and the foregoing discussion, the trial court erred both in denying Tenet's application for a writ of attachment and in granting the Silvers attorney's fees. Accordingly, we vacate those orders. Any other result would simply rewrite the parties' agreement and abrogate Tenet's rights under the guaranty.

¶ 21 Pursuant to the terms of the guaranty and A.R.S. § 12–341.01, we grant Tenet's request for attorney's fees on appeal upon its compliance with Rule 21, Ariz.R.Civ.App.P., 17B A.R.S.

WILLIAM E. DRUKE, Presiding Judge, concurring.

HOWARD, Judge, dissenting.

¶ 22 I agree completely with the majority's analysis of A.R.S. § 33–814 and with its reasoning and disposition concerning the writ of attachment. But I respectfully dissent from the majority's conclusion that the guaranty precludes the application of the collateral proceeds to the Silvers' liability on the guaranty. I submit that the guaranty is reasonably susceptible to both parties' interpretations and, accordingly, that summary judgment should have been denied.

¶ 23 Preliminarily, I disagree with the majority's viewing the evidence in the light most favorable to Tenet, as the party opposing summary judgment. While that is appropriate in reviewing the grant of summary judgment to the Silvers, it is inappropriate in determining whether to grant summary judgment to Tenet. In that instance, the facts should be viewed in the light most favorable to the Silvers, the party opposing that request for summary judgment. *See Nestle Ice Cream Co. v. Fuller,* 186 Ariz. 521, 523, 924 P.2d 1040, 1042 (App.1996). Because the majority construes the agreement as a matter of law, the difference is not important to its analysis. But, because I conclude an issue of fact exists on the intent of the parties to the agreement, the distinction is important here.

¶ 24 As with other contracts, our goal in construing a guaranty is to determine the intent of the parties *at the time the guaranty was executed. Taylor v. State Farm Mut. Auto. Ins. Co.,* 175 Ariz. 148, 153, 854 P.2d 1134, 1139 (1993); *see also Provident Nat'l Assurance Co. v. Sbrocca,* 180 Ariz. 464, 465, 885 P.2d 152, 153 (App.1994) (applying rules of contract interpretation to guaranty); Restatement (Second) of Contracts § 202 cmt. b (1981) ("In interpreting the words and conduct of the parties to a contract, a court seeks to put itself in the position they occupied at the time the contract was made.") If the language of the guaranty is reasonably susceptible to only one interpretation, we can construe the guaranty as a matter of law. *See Taylor,* 175 Ariz. at 158, 854 P.2d at 1144. But, when the terms of a guaranty are reasonably susceptible to more than one interpretation, parol evidence is admissible in order to determine the parties' true intent, and the determination of that intent is a question of fact. *See id.* at 158–59, 854 P.2d at 1144–45.

¶ 25 The Silvers argue that, according to the terms of the guaranty, the collateral proceeds that were applied to the outstanding balance on the note also apply to the limitation of their guaranty liability. The guaranty releases the Silvers from liability in two separate circumstances: (1) when the Silvers have paid $1.5 million of the "Guaranteed Obligations"; or (2) when "payment of One Million Dollars ... or more has been made on the outstanding principal balance of the Note." Although the $1.5 million cap contains language specifically requiring payments *by the Silvers* to satisfy the obligation, the $1 million limitation contains no similar requirement. It does not require the $1 million principal reduction to be made by any particular person, in any particular manner, or at any particular time. And Arizona law has recognized that an involuntary payment may still be considered a payment. *Nestle Ice Cream Co.,* 186 Ariz. at 523–24, 924 P.2d at 1042–43. Accordingly, the language of the

guaranty is reasonably susceptible to the Silvers' interpretation.

¶ 26 Furthermore, contrary to Tenet's argument, the Silvers' interpretation does not render any provision of the guaranty meaningless or ineffective. The entire term of TCC's $7 million note was less than ninety days. The guaranty contains several references to the bankruptcy code, and the parties clearly contemplated that TCC might default on the note. At the time the guaranty was signed, Tenet received the legal right to sue the Silvers without resort to the collateral or the primary obligor, TCC. This right could be very beneficial to Tenet if TCC filed a bankruptcy petition and Tenet was unable to pursue the collateral or TCC. The Silvers' interpretation—that the collateral proceeds apply to the $1 million limitation if the proceeds are received prior to judgment against them—does not eviscerate these provisions or diminish this valuable right. Furthermore, under this interpretation, the agreement is a guaranty of payment, not a guaranty of collection.

¶ 27 Tenet claims, however, that the sequence of events here would render the prompt payment provisions nugatory and turn the guaranty merely into a guaranty of collection. Tenet controlled the sequence of filing causes of action against the guarantors and/or TCC and the deed of trust sale. No provision in the guaranty required that Tenet sue all guarantors and TCC and give notice of the deed of trust sale simultaneously, as it chose to do. It is not entirely clear why Tenet was unable to proceed against the guarantors while TCC was under bankruptcy protection. But if the sequence of events resulted in Tenet receiving payments that inured to the Silvers' benefit, Tenet created the problem and must suffer any consequences. Although these subsequent events may affect the application of the guaranty, they do not transform it from a guaranty of payment into a guaranty of collection. *See Taylor*, 175 Ariz. at 153, 854 P.2d at 1139 (courts strive to effectuate parties' intent at time of contract's execution).[3]

¶ 28 Nor does the guaranty provision stating that the Silvers' liability is not affected by "any action taken or not taken" by Tenet render the Silvers' interpretation unreasonable. That phrase is modified by the language, "which action or inaction is herein consented and agreed to." In the guaranty, the Silvers agreed that they could be sued without resort to the collateral and that Tenet could, if it desired, collect simultaneously against the collateral and the guarantors. But the guaranty does not state that the Silvers agreed that Tenet did not have to apply the proceeds of that collection against the guaranty limitation. In fact, that is the very issue involved in the interpretation of the guaranty.

¶ 29 I agree with the majority that the guaranty is also reasonably susceptible to Tenet's interpretation. But I disagree with the majority's implicit conclusion that Tenet's interpretation is the only reasonable interpretation. The majority relies on several out-of-state cases to support its conclusion. In *Bank of America National Trust & Savings Ass'n v. Schulson*, 305 Ill.App.3d 941, 239 Ill.Dec. 462, 714 N.E.2d 20, 23 (1999), the guaranty provided that the guarantors' liability was reduced by thirty-six percent of any "principal payments made with respect to the Liabilities, but only to the extent that the amount of any such principal payments [we]re not subsequently reborrowed by Debtor." This language focuses on payments made, not on reduction of the outstanding principal balance. And, based on this language, the court could have reasonably determined that the language contemplated an ongoing, prebreach relationship with the debtor at the time the "principal payments" were made. Presumably, the borrower would not be reborrowing sums after breaching the agreement. There is no such language in the guaranty in this case. *Schulson* thus presents a stronger case for interpreting the agreement to require predefault voluntary payment.

3. Additionally, the Silvers' position in the trial court that Tenet could not obtain judgment against them because it might eventually recover its debt from the collateral was simply erroneous under the language of the guaranty and similarly cannot change the original nature of the guaranty.

¶ 30 The guaranty in *MacCulley v. Fidelity Federal Savings & Loan Ass'n of Ocala*, 335 So.2d 327, 329 (Fla.Dist.Ct.App.1976), required reduction of the debt to a certain level in order to release the guarantor, rather than a reduction of a certain amount, as here. Nevertheless, the language is similar. But, unlike the guaranty here, the guaranty in *MacCulley* stated that the guarantor was a "party" to the underlying obligation, which would support a finding of continuing liability. *Id.* Furthermore, the majority in that case did not explain the basis for its conclusion that the guaranty required the *debtor* to reduce the debt below the specified level before default could trigger the release provision. *See id.* at 330. This deficiency in the majority's reasoning in *MacCulley* was the subject of a dissent in that case. *Id.* at 331–32 (Boyer, C.J., dissenting). To the extent that *MacCulley* bolsters Tenet's position, I disagree with it as I do with the majority here.

¶ 31 The guaranty in *TMG Life Insurance Co. v. Ashner*, 21 Kan.App.2d 234, 898 P.2d 1145, 1153 (1995), provided that the guarantor's liability was "limited to an amount equal to one-third of the amount of the [l]oan from time to time outstanding." The court held that the entire amount of the collateral proceeds did not apply to extinguish the guarantor's liability. *Id.* at 1155. But it also stated that the guarantor's liability was not fixed at the time of default and that the guarantor only remained liable for one-third of the debt after receipt of the collateral proceeds. *Id.* at 1155–56. This in fact supports the Silvers' interpretation of their guaranty. And finally, the court in *Ashner* also noted that each case is fact-intensive and that other cases " 'are generally not controlling' " in interpreting a guaranty. *Id.* at 1155, *quoting* 38 Am.Jur.2d *Guaranty* § 70, p. 1071. *Ashner* supports the Silvers' position far more than Tenet's.

¶ 32 In *Southern Bank & Trust Co. v. Harley*, 292 S.C. 340, 356 S.E.2d 410, 410 (App.1987), the guaranty contained the following language of limitation: "provided, however, the liability of the undersigned hereunder shall not exceed at any one time a total of ... $775,000.00 ...." The limitation made no reference to reduction of the principal balance, as the Silvers' limitation does; rather, it provided that the guarantors were liable up to a specific sum. The court simply applied the collateral proceeds to the underlying debt, determined that an amount less than $775,000 remained, and ordered judgment in that amount. *Id.* at 411. *Harley* has no application to the Silvers' guaranty.

¶ 33 In *Crown Life Insurance Co. v. LaBonte*, 111 Wis.2d 26, 330 N.W.2d 201, 203 (1983), the limitation provided that it would remain effective until the first $45,000 of principal had "been fully performed and observed *by the Debtor.*" (Emphasis added.) The court specifically relied on the phrase, "by the Debtor," in construing the limitation. *Id.* at 205. The limitation here contains no such language. Likewise, the guaranty in *Preston Ridge Financial Services Corp. v. Tyler*, 796 S.W.2d 772, 779 (Tex.Ct.App. 1990), contained specific language from which the court concluded that only the debtor could "reduce the guaranteed indebtedness." Again, we have no similar language here.

¶ 34 The majority states that if the Silvers' liability was not triggered when the principal defaulted, Tenet's only recourse would have been to wait until the trustee's sale, apply the proceeds to the principal debt, and then sue the Silvers. The Silvers' interpretation does not require that and, in fact, suggests the opposite. As the Silvers conceded at oral argument, they breached the contract by failing to pay on demand. That does not necessarily mean that the amount of their liability was forever fixed at that time. *See Ashner.* The best course of action under the Silvers' interpretation would have been for Tenet to obtain judgment against the Silvers first for the breach of the guaranty, thereby fixing the amount of the Silvers' liability. Tenet then could conduct the trustee's sale. At that point, the proceeds of the trustee's sale could not have been applied to the $1 million principal reduction requirement.

¶ 35 The majority also mentions that the Silvers failed to pay on demand when required, thereby depriving Tenet of due and prompt payment as contemplated. The Silvers did breach the agreement to pay on demand. But that does not fix the amount of their liability. If, for example, the collateral proceeds paid the entire debt after the default, no one would dispute that they would then have been released from their guaranty. Thus, their breach of the promise to pay

promptly does not bear on the issue of whether the parties intended the collateral proceeds to apply to the release provision.

¶ 36 Because the guaranty here is reasonably susceptible to both interpretations, the parties' true intent is a material question of fact that may be resolved using parol evidence. *Taylor,* 175 Ariz. at 159, 854 P.2d at 1145. Summary judgment is only appropriate after a conclusion that there is "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Ariz.R.Civ.P. 56(c)(1), 16 A.R.S., Pt. 2. And, in considering granting summary judgment to Tenet, we should construe the facts most favorably to the Silvers. *See Nestle Ice Cream Co.* Accordingly, "[e]ven though cross motions for summary judgment [are] filed, a court may not grant a summary judgment unless there remains no genuine issue as to any material fact and one of the parties is entitled to judgment as a matter of law." *Grain Dealers Mut. Ins. Co. v. James,* 118 Ariz. 116, 118, 575 P.2d 315, 317 (1978). Likewise, that the parties do not dispute the facts does not make summary judgment appropriate in the absence of such a conclusion. *See Nelson v. Phoenix Resort Corp.,* 181 Ariz. 188, 191, 888 P.2d 1375, 1378 (App.1994) ("Summary judgment is inappropriate where the facts, even if undisputed, would allow reasonable minds to differ."); *State ex rel. Arizona Dep't of Revenue v. Cochise Airlines,* 128 Ariz. 432, 437–38, 626 P.2d 596, 601–02 (App.1980) (if stipulation for cross-motions for summary judgment omits important fact, cross-motions deniable); *see also Stewart v. United States,* 739 F.2d 411, 414 (9th Cir.1984) ("When a material issue of fact is not addressed in a statement of stipulated facts, summary judgment is improper for either party."); Charles Alan Wright et al., *Federal Practice and Procedure* § 2724, at 400 (1998) ("[E]ven if some facts are stipulated, summary judgment must be denied if the stipulation is equivocal or if a genuine issue of material fact remains in dispute despite the stipulation."). Consequently, the trial court erred by granting summary judgment. *See* Ariz.R.Civ.P. 56(c)(1).

¶ 37 Based on the parties' failure to present any parol evidence, it is understandable that the trial court ruled on the motions as a matter of law. *See Scholten v. Blackhawk*

*Partners,* 184 Ariz. 326, 328, 909 P.2d 393, 395 (App.1995) (interpretation of contract is matter of law and not question of fact). Deciding solely on the language of the guaranty, I would have no difficulty in construing the guaranty in favor of the Silvers and upholding the trial court. *See Consolidated Roofing & Supply Co. v. Grimm,* 140 Ariz. 452, 455, 682 P.2d 457, 460 (App.1984) (guaranties construed to limit liability of guarantor). Tenet cannot belatedly add the words "voluntary and pre-default" before the word "payment" in the limitation. But, because this appeal arises from the trial court's ruling on cross-motions for summary judgment, it is not necessary to reach that conclusion.

¶ 38 When an agreement is reasonably susceptible to both parties' interpretations, a trial court should not be forced into granting summary judgment for either side without a complete knowledge of the facts. This is not a case in which the agreement is many years old and the parties who originally entered into the agreement are unavailable. The Silvers' and Tenet's representatives are presumably still available. Because our standard of review is de novo, *Hahn v. Pima County,* 200 Ariz. 167, ¶ 4, 24 P.3d 614, ¶ 4 (App.2001), this court should reverse the judgment, remand the case for further proceedings, and instruct the trial court to deny both parties' motions for summary judgment.